664 So.2d 577 (1995)
Barbara DUFOUR and Barry Dufour, Plaintiffs-Appellants,
v.
Lovell John MAYEUX, Jr., M.D., et al., Defendants-Appellees.
No. 95-678.
Court of Appeal of Louisiana, Third Circuit.
November 2, 1995.
Writ Denied February 2, 1996.
*578 Kent Mercier, for Barbara Dufour & Barry Dufour.
Eugene Joseph Sues, for L.J. Mayeux M.D., et al.
Before DOUCET, C.J., AMY and SULLIVAN, JJ.
*579 SULLIVAN, Judge.
This is a medical malpractice case. Plaintiffs, Barbara and Barry Dufour, filed this suit against defendants, Dr. Lovell John Mayeux, Jr. and Louisiana Medical Mutual Insurance Company, alleging that, through the fault and negligence of Dr. Mayeux, Barbara became wrongfully addicted to the prescription pain drugs Fiorinal and Fiorinal with codeine (Fiorinal # 3). Defendants filed an exception of prescription, asserting that the suit was time barred pursuant to La.R.S. 9:5628 because of plaintiffs' failure to file suit within one (1) year of the date upon which they knew or reasonably should have discovered the alleged malpractice and resulting damage.
The trial court, after conducting a hearing, granted defendants' exception and dismissed plaintiffs' suit with prejudice. In oral reasons assigned, the trial judge concluded that the suit, which was filed on November 4, 1991, had prescribed because it was filed more than one (1) year after October 12, 1990, the date of Dr. Mayeux's last examination of Barbara. He further determined that Barbara was "an intelligent lady" who "knew she had a problem" and that clearly "her addiction to Fiorinal predated October 12 [1990] by a long time."
Plaintiffs appeal the finding that their claim has prescribed and the trial court's evidentiary ruling excluding Barry's testimony concerning the date that another physician told him that Dr. Mayeux had been improperly treating his wife. Our thorough review of the record reveals no error in the trial court's judgment. Accordingly, we affirm.

FACTS
Plaintiffs alleged in their petition that, between 1988 and 1990, the actions of Dr. Mayeux in repeatedly prescribing Fiorinal and Fiorinal # 3 to Barbara without being aware that it was causing her to become addicted to the drug constituted malpractice. Fiorinal and Fiorinal # 3 are considered Schedule III narcotic pain medications. The record indicates that the treatment period in question spanned two (2) years and four (4) months from June 10, 1988 to October 12, 1990.
Dr. Mayeux is a board certified family physician in Marksville, Louisiana. Barbara's first visit to Dr. Mayeux occurred on September 15, 1983. He saw her four (4) more times in 1983 and on five (5) occasions in 1984. On the final doctor/patient interaction of 1984 on June 29, Dr. Mayeux prescribed plain Fiorinal to Barbara for the first time. In 1985, he saw her four (4) times and prescribed plain Fiorinal once for headaches on February 26, 1985. During this early treatment period, Barbara suffered from various maladies including a duodenal ulcer, an ovarian cyst, a fractured toe, anxiety, depression and headaches.
At some point after her last 1985 visit to Dr. Mayeux, the Dufours moved from the Marksville area to Jennings, Louisiana. In 1988, they moved back to Plaucheville, which is near Marksville. Dr. Barry Edwards, a Jennings physician, had previously diagnosed mitral stenosis, commonly known as degenerative neck joint disease. Barbara returned to Dr. Mayeux on June 10, 1988 complaining of headaches. Dr. Mayeux's examination revealed crepitus, a scraping sensation in the neck which causes headaches. He prescribed forty (40) Fiorinal # 3.
On June 27, 1988, Barbara was admitted to Briarwood Hospital for treatment of psychological problems. She remained there on inpatient status until her discharge on July 22, 1988. The records of her stay there are included as an exhibit in this case. She was diagnosed with (1) major depression, recurrent; (2) passive/aggressive traits; and (3) tension and vascular headaches, cervical spine disease. On admission, she gave a medical history of headaches and neck pain. She stated that she took Fiorinal # 3 for this chronic condition and that she was afraid of becoming dependent upon the medication.
Barry informed the Briarwood social worker that Barbara became aware of her Fiorinal abuse "about a year and a half ago," i.e., early 1987. Barry also stated that he became aware of her problem "about a year ago" when he noticed excessive drug bills. According to the Briarwood records, Barry explained to the staff that Barbara would go to numerous doctors "all around" to get new *580 prescriptions and would stop seeing a particular doctor once he discovered Barbara's overuse and refused to refill the prescription. Barry stated that, at one point, he found thirty (30) to thirty-five (35) prescription bottles belonging to Barbara in their home.
At Briarwood, Barbara was treated for her psychological and emotional problems. According to the records, she made marked improvements in her mental state and was released with a good prognosis. However, her substance abuse problem was neither addressed or treated. She was released with the following medication regimen: Prozac 20 mg; Seldane 60 mg; Premarin .625 mg daily; Flexiril 10 mg three times daily; and Lithium 600 mg twice daily.
Upon her release, she saw Dr. Mayeux four (4) more times in 1988 for cervical and lumbar pain. Each time, he prescribed Fiorinal # 3. In 1989, Dr. Mayeux examined Barbara a total of twenty-four (24) times, primarily for tension and migraine headaches and also for lumbar pain. The record indicates that he prescribed Fiorinal # 3 eighteen (18) times, of which twelve (12) times were with no refill and six (6) times were with one (1) refill.
Also in 1989, Barbara underwent a cervical diskectomy and fusion which was performed by Dr. Stephen Goldware, a Lafayette neurosurgeon. This surgery was performed on May 11, 1989. Prior thereto, Dr. Mayeux was not aware that she was to undergo neck surgery. He learned about it on her first visit to him after the surgery. In 1989, she saw Dr. Mayeux ten (10) times before the surgery and fourteen (14) times thereafter.
In 1990, Dr. Mayeux examined, saw or called in a prescription for Barbara on nineteen (19) separate occasions. He prescribed Fiorinal # 3 ten (10) times, eight (8) of which included one (1) refill. Dr. Mayeux prescribed plain Fiorinal six (6) times during 1990. On the date of her final visit, October 12, 1990, Dr. Mayeux prescribed thirty (30) Fiorinal # 3 with no refill for her neck and shoulder pain complaints.
On November 6, 1990, Barbara was admitted to the Rapides Regional Medical Center emergency room for treatment of a drug overdose. She had been found unconscious in an area hotel room by emergency ambulance paramedics. Hospital medical personnel pumped her stomach and stabilized her. The hospital records indicate that, thereafter, she became angry, pulled out her IVS and left against medical advice.
The next day, her husband Barry contacted the Avoyelles Parish Coroner, Dr. F.P. Bordelon, for purposes of having Barbara committed to an inpatient drug abuse treatment facility. Dr. Bordelon signed the commitment papers, and Barbara was admitted to Rapides Regional's Chemical Dependency Services. The certified records of that facility show that, on admission, Barbara acknowledged to her social worker that she had been abusing prescription drugs for thirteen (13) years. She was diagnosed as having significant depression with an unstable personality pattern and low self esteem. She successfully completed treatment and was released from Chemical Dependency Services in December 1990.
Plaintiffs filed a medical malpractice complaint with the Commissioner of Insurance on November 4, 1991. The medical review panel proceedings resulted in a finding that Dr. Mayeux, in treating Barbara, did not perform below the applicable standard of care.
On April 22, 1993, the Dufours filed this suit in district court. After a period of discovery, defendants filed the present exception of prescription along with a separate motion for summary judgment (on the merits of the case) on February 23, 1995. On March 6, 1995, Dr. Mayeux filed a reconventional demand against the Dufours seeking damages for their filing suit against him based upon allegedly known untrue allegations.
The trial court held a hearing on the prescription exception on March 10, 1995. Dr. Mayeux, Barbara and Barry were the only witnesses to testify. Dr. Mayeux stated that he had not seen, examined or treated Barbara since October 12, 1990, the date upon which he last prescribed Fiorinal to her. He stated further that the recommended daily maximum dosage of Fiorinal and Fiorinal # 3 is six (6) tablets. He explained that his *581 prescriptions to Barbara never exceeded this recommended daily maximum.
Additionally, Dr. Mayeux acknowledged his awareness of the Dufours' separate pending suit against Eckerd Drugs and two (2) Eckerd pharmacists, Ann Wilson and Wayne Davis, alleging that the defendants therein improperly and without a doctor's prescription provided Barbara with Fiorinal and Fiorinal # 3. Upon examination of an Eckerd computer printout listing Barbara's drug history, Dr. Mayeux explained that the Eckerd employees used his name illegally to dispense Fiorinal and Fiorinal # 3 to Barbara. For instance, the computer printout shows that he authorized the dispensation of forty-five (45) pills on October 15, 1990, three (3) pills on October 22, 1990, and twenty-seven (27) pills with two (2) refills on October 27, 1990. Dr. Mayeux explained specifically that he never authorized these prescriptions and generally that he never prescribes more than thirty (30) Fiorinal or Fiorinal # 3, always prescribes such medicine in quantities of twenty (20) or thirty (30), and never gives a patient more than one (1) refill. While Barbara was given ninety (90) Fiorinal # 3 pills under his name by Eckerd in October 1990, only the October 12 prescription of thirty (30) was authorized.
The Eckerd printout also reveals a large number of dispensations purportedly authorized by Dr. Goldware in October 1990. Dr. Mayeux commented that, solely based upon his examination of the printout, it appeared that Dr. Goldware was Barbara's treating physician from October 12 to November 5, 1990, the date on which she filled the last Goldware prescription. The record indicates, however, that Dr. Goldware released Barbara from his care soon after her surgery in May 1989 and that he did not see her in October 1990.
On cross examination, Dr. Mayeux stated that he prescribed Fiorinal and Fiorinal # 3 with the following instructions: take one (1) every six (6) to eight (8) hours as needed for pain. He denied that, if she took the October 12, 1990 prescription as instructed, any codeine would have remained in her system from this prescription on November 6, 1990, the date of her overdose. Dr. Mayeux could not say with specificity when Barbara ceased being his patient. He stated that, in his years of practice, he had never sent a letter to a patient to terminate a physician-patient relationship. He denied ever hearing of a doctor employing this practice to end the relationship. Dr. Mayeux concluded that, as a patient, Barbara should have taken some measure of responsibility in the taking of her medication.
Barbara did not agree that, upon entering Chemical Dependency Services, she admitted to a thirteen (13) year history of drug abuse. However, she did not deny that she did, in fact, have such a history. She acknowledged the existence of the separate suit against Eckerd and its pharmaceutical personnel. Midway through her testimony, she stated that, although she did not always have a written prescription from Dr. Mayeux with her when she went to Eckerd's, she was under the impression that Dr. Mayeux had approved the refills. The trial judge then sharply questioned her on the apparent inconsistent allegations in the separate suits. Her counsel objected and explained that his client did not mean to say that Dr. Mayeux had authorized all of the refills and that, in her answer, she was referring to the October 1990 refills. Barbara then agreed with this.
According to Barbara, by October 1990, Dr. Goldware had long since released her and was no longer treating her. She did not see or talk to Dr. Goldware in October 1990. When asked how she was able to get Fiorinal # 3 under his name during that month, she remembered having called Dr. Goldware's office while in pain and asking for medicine. She had run out of Dr. Mayeux's prescription. When asked by the trial judge why she did not simply call Dr. Mayeux's office to request a refill, she replied that she did not know.
Barbara acknowledged her treatment at Briarwood in 1988 for mental chaos and confusion. She may have told the medical personnel there that she felt she had a problem with Fiorinal # 3. Briarwood, however, did not treat or counsel her about her drug problem. She was not told by Briarwood personnel that Fiorinal and Fiorinal # 3 were part of her problem. However, Barbara *582 admitted that nothing prevented her from asking them if Dr. Mayeux's treatment with these drugs was inappropriate. She stated that she was first told that Dr. Mayeux acted improperly when she was undergoing treatment at Chemical Dependency Services in November 1990.
Barbara also denied going to the Our Lady of Lourdes Hospital emergency room on April 30, 1989 solely for purposes of acquiring drugs. Hospital records indicate that she complained of knee pain resulting from a fall down one (1) flight of stairs. The attending physician noted a superficial injury and discharged her with the following diagnosis: "drug seeking behavior." She was not given any medication.
Barry also testified at the hearing. He said that, between 1988 and 1990, he was not aware that Barbara was, at one point, taking as many as thirteen (13) pain pills per day. He stated that, in June 1988 when Barbara was admitted into Briarwood, he felt that Barbara had a problem with prescription drugs but that she was not at the time addicted to them. He could not recall telling the Briarwood medical personnel that he had learned of Barbara's Fiorinal abuse in June of 1987. He acknowledged that he "may have" stated that she had been going to different doctors to get Fiorinal.
Barry did not, between 1985 and 1990, check any pill bottles, pharmacy bills or insurance filings to see if Barbara was abusing Fiorinal or Fiorinal # 3. When he found the large number of Fiorinal pill bottles in 1988, he did not ask any independent medical professionals if Dr. Mayeux's care of Barbara was appropriate. On November 6, 1990 (the day of her overdose), after obtaining computer printouts from Eckerd Drugs and Scallan's Pharmacy, he spoke with Dr. Bordelon, who authorized Barbara's commitment. Defendants objected on the basis of hearsay to allowing Barry to state the substance of Dr. Bordelon's comments to him. Plaintiffs argued that the statement was not hearsay because it was not being offered to prove its truth but to show the date upon which it was communicated to Barry and his state of mind upon hearing Dr. Bordelon's statement. The trial court sustained defendants' objection, finding the statement to be hearsay for which no exception applied. By way of a proffer, however, Barry said that on November 7, 1990, Dr. Bordelon told him that Dr. Mayeux's treatment of Barbara with Fiorinal and Fiorinal # 3 was ridiculous and that he should not have prescribed that much medicine to one (1) individual. This statement was based upon Dr. Bordelon's review of the pharmacy computer printouts.

HEARSAY RULING
The Dufours first contend that the trial court erred in ruling that Dr. Bordelon's statement to Barry was hearsay. They assert that it was not hearsay because it was not offered to prove its truth but to show that it was said on a particular date. Plaintiffs also argue that the statement was offered to show Barry's state of mind when it was said and that he discovered Dr. Mayeux's alleged wrongdoing upon hearing the statement from Dr. Bordelon. Defendants counter that the trial court correctly ruled the statement to be inadmissible hearsay, a statement of a declarant who did not himself testify.
La.Code Evid. art. 801(C) defines "hearsay" as "a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted." Hearsay is not admissible except as provided by the Louisiana Code of Evidence or other legislation. La.Code Evid. art. 802. Hearsay is regarded as unreliable because it is based on statements made by persons who are not before the court, have not been sworn and are not available for cross examination. State v. Tate, 25,765 (La.App. 2 Cir. 2/23/94), 632 So.2d 1213. In State v. Hicks, 607 So.2d 937 (La.App. 2 Cir.1992), the second circuit rejected the argument that otherwise hearsay evidence could be admitted solely because it was being offered only for the fact that it was stated. The court reasoned that:
If a statement is not introduced to prove the truth of the matter asserted, then that statement, by definition, is not hearsay. LSA-C.E. art. 801. See also, State v. Bean 582 So.2d 947 (La.App.2d Cir.1991), *583 writ denied, 586 So.2d 567 (La.1991); State v. Veal, 583 So.2d 901 (La.App. 1st Cir. 1991). However the mere assertion that the hearsay rule does not apply, if the statement is offered only for the fact that it was stated and not as proof of the fact in the statement, is not a correct statement of the law. Any testimony could be admitted under this reasoning by the fiction that the testimony is elicited "for the mere fact it was stated" rather than for its truth. There must be some purpose in admitting the testimony other than to show the truth of the matter. See and compare, State v. Bean, supra, and State v. Veal, supra.

Id. at 946-47.
We agree with the second circuit's approach to this question. Dr. Bordelon's statement was made by a declarant who did not testify under oath at the hearing and was therefore not subject to cross examination by the defendants. The statement should not be admitted into evidence solely under the guise that it is not being offered to prove its truth. Plaintiffs could have called Dr. Bordelon as a witness or subpoenaed his presence at the hearing to testify. They did not do so. Therefore, the statement is not admissible through Barry's testimony.
Plaintiffs assert that the statement, if hearsay, was nonetheless admissible under a hearsay exception to prove Barry's state of mind at the time it was said. This is a purpose for which the Code of Evidence makes no exception to the general rule of hearsay inadmissibility. Our review of the pertinent code provisions reveals that only La.Code Evid. art. 803(3) provides for an exception for "[T]hen existing mental, emotional, or physical condition." However, this exception applies to the declarant's then existing state of mind. It does not apply to the witness' state of mind upon hearing the statement from the declarant.
For these reasons, the Dufours' first assignment of error lacks merit. The trial court ruling on the hearsay objection was correct.

PRESCRIPTION
The Dufours next contend that the trial court erred in ruling that their claim against Dr. Mayeux had prescribed. The trial judge found that the "operative date" was October 12, 1990, the date upon which Dr. Mayeux last saw Barbara and last prescribed Fiorinal # 3. He concluded that prescription began to run on that date. The Dufours assert that prescription actually began to run on November 7, 1990, the date upon which Barry first obtained the requisite knowledge of Dr. Mayeux's alleged wrongdoing.
La.R.S. 9:5628 provides that actions for medical malpractice prescribe one year from the date of the alleged act, omission or negligence or within one year from the date of discovery of the alleged act, omission or negligence. In Richardson v. Moffett, 608 So.2d 275, 276-77 (La.App. 3 Cir.1992), writ denied, 612 So.2d 81 (La.1993), this court explained the applicable prescription rules as follows:
The one year prescriptive period commences running on the date in which the injured party discovers or should have discovered the facts upon which his cause of action is based. Griffin v. Kinberger, 507 So.2d 821 (La.1987). Constructive knowledge sufficient to commence the running of prescription, however, requires more than a mere apprehension that something might be wrong. Cordova v. Hartford Acc. & Indem. Co., 387 So.2d 574 (La.1980). Prescription does not run against one who is ignorant of the facts upon which his cause of action is based, as long as such ignorance is not willful, negligent or unreasonable. Young v. Clement, 367 So.2d 828 (La.1979). Therefore, even if a malpractice victim is aware that an undesirable condition developed at some point in time after the medical treatment, prescription does not run as long as it was reasonable for the victim not to recognize that the condition may be related to treatment. The proper focus is on the reasonableness of the tort victim's action or inaction. Griffin, supra.
In Taylor v. Giddens, 607 So.2d 878 (La.App. 2 Cir.1992), writ granted, 612 So.2d 43 (La. 1993), affirmed in part, reversed in part and *584 remanded, 618 So.2d 834 (La.1993)[1], the second circuit emphasized that the analysis requires the court to focus upon the particular facts of the case before it. The court enunciated the criterion to apply as follows:
The focus is on the reasonableness of the inaction by plaintiffs. The rule is whether the cause of action was known or reasonably "knowable" by plaintiff. Prescription does not run only as long as it is reasonable for plaintiffs not to recognize that the condition may be related to treatment. When a plaintiff has knowledge of facts strongly suggestive that the untoward condition or result may be the result of improper treatment and there is no effort by the health care providers to mislead or cover up information which is available to plaintiff through inquiry or professional medical or legal advice, then the facts and cause of action are reasonably knowable to plaintiff. Inaction by plaintiff for more than one year under these circumstances is not reasonable.
Each case must be decided on its own peculiar facts. The law does not require that a patient be informed by an attorney that he has a medical malpractice action before prescription will begin to run. Likewise, it is not a requirement that a patient be informed by a medical practitioner of possible malpractice before prescription will begin to toll. The court may take into consideration such factors as the plaintiff's educational background, intelligence and past experience with medical procedures in assessing whether or not he has knowledge.
(Citations omitted; emphasis ours.) Id. at 881-82.
The Dufours contend that Dr. Mayeux's treatment of Barbara constituted a continuing tort for which "prescription does not begin to run until the conduct causing the damage is abated." South Central Bell Telephone Company v. Texaco, Inc., 418 So.2d 531, 533 (La.1982). In order to allege a continuing tort, the plaintiffs must allege both continuous action and continuous damage. Chiasson v. Doe, 618 So.2d 38 (La.App. 3 Cir.), writ denied, 624 So.2d 1225 (La.1993); Crawford v. Howard, 539 So.2d 735 (La.App. 3 Cir.), writ denied, 541 So.2d 840 (La.1989). The plaintiffs assert that, since neither party did an affirmative act to terminate the physician-patient relationship before November 7, 1990, prescription did not commence to run until that date when Barry became aware of Dr. Mayeux's alleged transgressions. In other words, although Dr. Mayeux last saw Barbara and prescribed Fiorinal # 3 to her on October 12, 1990, plaintiffs argue that they were reasonable in assuming that the physician-patient relationship continued after that date.
We disagree. The plaintiffs are required to allege continuing action on the part of Dr. Mayeux and continuing damage resulting therefrom. The final act taken by Dr. Mayeux in his lengthy treatment history of Barbara was on October 12, 1990. Therefore, plaintiffs have failed to show that Dr. Mayeux's actions extended beyond October 12, 1990. We expressly decline to impose upon the physician an affirmative duty to inform his patient in writing that the physician-patient relationship has been terminated.
We further conclude that, upon evaluation of the particular facts of this case with reference to the precepts discussed in Richardson, 608 So.2d 275 and Taylor, 607 So.2d 878, prescription began to run no later than on October 12, 1990. Arguably, plaintiffs should have reasonably discovered facts upon which their cause of action was based earlier than in October 1990. Indeed, the documentary evidence entered into the record suggests *585 strongly that the Dufours knew of Barbara's drug problem or addiction as early as June of 1988, just after she returned to Dr. Mayeux's care after a three (3) year absence. While they may not have, at that time, known of the actionable facts insofar as Dr. Mayeux's treatment was concerned, it was unreasonable for Barbara and Barry to not recognize that her condition was related, at least in some part, to Dr. Mayeux's treatment of her. The plaintiffs had an obligation to further investigate the facts in order to pursue their claim against Dr. Mayeux before the prescriptive period ran.
There was no effort by Dr. Mayeux to mislead plaintiffs or conceal information that was available to the Dufours through reasonable medical or legal inquiry. As stated in Taylor, 607 So.2d 878, the patient is not required to hear from an independent medical practitioner that malpractice may have occurred before prescription will begin to run.
Under these facts, plaintiffs' inaction until the filing of the complaint invoking the medical review panel procedure on November 4, 1991 was not reasonable. Therefore, we conclude that the trial court did not err in granting defendants' exception of prescription.

DECREE
For the above reasons, the trial court's judgment rendered in favor of defendants, Dr. Lovell John Mayeux, Jr. and the Louisiana Medical Mutual Insurance Company, and against plaintiffs, Barbara and Barry Dufour, dismissing their suit with prejudice, is affirmed. Costs of this appeal are to be paid by Barbara and Barry Dufour.
AFFIRMED.
NOTES
[1] In Taylor, 607 So.2d 878, the second circuit affirmed the trial court's judgment granting the health care providers' exception of prescription as to plaintiffs' survival and wrongful death actions. The Supreme Court of Louisiana affirmed the ruling on the survival action issue pursuant to La.R.S. 9:5628. However, the supreme court reversed the second circuit on the wrongful death action issue, finding that its prescriptive period was governed not by La.R.S. 9:5628 but instead by the general prescriptive articles applicable to delictual actions. We consider the legal efficacy of the above-cited excerpt from the second circuit's opinion in Taylor to have not been affected by the supreme court's disposition of that case. The quoted section represents well settled and generally applicable principles of the law of prescription in medical malpractice cases.