|, COOKS, Judge.
Plaintiffs appeal the judgment of the trial court holding their claim for medical malpractice had prescribed. For the following reasons, we reverse.
FACTS
Pamela Benoit was first seen by Dr. D. Dale Archer, Jr., in October of 1988. She related to him a history of experiencing anxiety and depression. Mrs. Benoit also told Dr. Archer she was then taking Tran-zene, but complained it made her sleepy. Dr. Archer diagnosed her as having “generalized anxiety,” prescribed her Xanax, and scheduled a follow up appointment a month later. For a six year period, Dr. Archer continued prescribing Xanax to treat Mrs. Benoit’s anxiety condition.
According to Mrs. Benoit, on November 11, 1994 she sought a second opinion from Dr. John Bambenek and was informed that the prolonged use of Xanax prescribed by Dr. Archer was inappropriate. She was prescribed Prozac instead. Multiple attempts were made to wean Mrs. Benoit off Xanax with unsuccessful results. She eventually required inpatient treatment for Benzodiazepine dependence, and was successfully weaned off Xanax.
A medical malpractice action was filed with the Patient’s Compensation Fund on November 13, 1995. Mrs. Benoit alleged, as a result of the prolonged use of Xanax, she sustained brain damage which she described as cognitive deficits which are permanent and disabling. Her husband and son joined in her suit claiming loss of consortium.
A medical review panel rendered an opinion in favor of Mrs. Benoit.[1] A law-suitlawas subsequently filed in district court. Dr. Archer filed a Peremptory Exception of Prescription, contending more than one year prior to filing her medical malpractice action, Pam Benoit and her husband knew or should have known the acts they complain he committed may have constituted malpractice. Specifically, Dr. Archer points to Pam Benoit’s visit to Dr. Aretta Rathmell “in late 1993 or early 1994,” and sessions she had in September and October of 1994 with Ruth Singletary, a social worker. The comments made during these visits, defendants urge were sufficient to inform plaintiffs that the treatment by Dr. Archer may have been improper. The trial court eventually maintained the exception of prescription, dismissing the plaintiffs’ claim as untimely filed with the Patient’s Compensation Fund.
Plaintiffs appealed contending the trial court erred in maintaining the exception of prescription “given that Appellant was first advised of the inappropriateness of Appellee’s medical treatment on November 11, 1994 (the date she first consulted with Dr. Bombenek) and filed her complaint with the Louisiana Patient’s Compensation Fund on November 13, 1995.” Plaintiffs noted November 11, 1995 fell on a Saturday.
ANALYSIS
The prescriptive period applicable to medical malpractice actions is governed by La.R.S. 9:5628 which provides that such *1277 actions must be filed within one year from the date of the alleged act, omission or neglect, or within one year from the date of discovery of the alleged act, omission or neglect. In any event, even as to claims filed within one year from the date of such discovery, such claims must be filed, at the latest, within a period of three years from the date of the alleged act, omission or neglect. La.R.S. 9:5628.
The prescription issue presented, thus, requires a determination of when plaintiffs knew or should have known that the continued prescribing of Xanax to her by Dr. Archer was medically negligent. This court in Parker v. Dr. X, 97-841, p. 4 (La.App. 3 Cir. 12/10/97), 704 So.2d 373, 375, quoted the following language from Harlan v. Roberts, 565 So.2d 482, 486 (La. App. 2 Cir.), writ denied, 567 So.2d 1126 (La.1990):
A review of the jurisprudence dealing with prescription in medical malpractice indicates that each case must be decided on its own peculiar facts. The law does not require that a patient be informed by an attorney he has a medical malpractice action before prescription begins to run. Likewise, it is not a requirement that a patient be informed by a medical practitioner of possible malpractice before prescription will begin to toll. The court may take into consideration such factors as the patient’s educational background, intelligence and past experience with medical procedures in assessing whether or not he had knowledge.
Dr. Archer argued Mrs. Benoit’s visits to Dr. Rathmell and Ruth Singletary were sufficient to impute knowledge to her that she may have been the victim of medical malpractice. Dr. Archer cites the deposition testimony of Mrs. Benoit in support of his argument that Dr. Rathmell told her and her husband that she “had to get off that Xanax.” Dr. Rathmell testified about her visit with Mrs. Benoit:
Q. Do you recall any discussion with her and her husband about her use of Xanax at that time of whether it was appropriate or inappropriate?
A. I do not recall that. It would probably be standard procedure for me not to discuss that in the face of an acute problem that I thought required inpatient care, but I don’t recall that.
Q. So your recollection is you saw her, she appeared to be in a condition where she needed immediate medical attention probably as a result of some medication she was taking?
A. No.
Q. Okay.
A. My recall is seeing her husband having to help her in, basically carrying her in. My — my recall says I remember her being what I thought was toxic. That’s just an impression.
Q. Uh-huh (yes).
A. I don’t recall making an opinion or a judgment one way or the other about any Xanax or any specific medication. I just recall her being very\Aill, thinking she needed in the hospital, that it was more than I felt comfortable trying to treat on an outpatient. That’s all I recall.
Q. On the occasion of someone presenting to a psychiatrist in the condition you recall Mrs. Benoit being, your recommendation would be, “Get to the hospital, you need some treatment right now?”
A. Yes.
Q. Is that correct?
A. That would be because in my opinion, I thought there was something life threatening one way or the other about her. In terms of making a specific diagnosis of saying, it was an acute *1278 psychosis from schizophrenia or a medication overdose, I don't know that I have arrived at that conclusion. I don’t even know that that would he a standard for me. I would be making a judgment, is somebody’s life in danger, is somebody far more than what 1 feel comfortable trying to handle on an outpatient, is there a support system that would ensure her safety? Those are the kinds of questions I would ask. I wouldn’t be looking for a specific diagnosis.
(Emphasis added.)
Contrary to Dr. Archer’s factual claim, Dr. Rathmell testified she did not recall discussing with Mrs. Benoit or her husband the inappropriateness of continued use of Xanax, and she clearly indicated it would not have been her practice to do so particularly when “face[d] with an acute problem that [she] thought required impatient care.” Nor was there any specific mention of Dr. Archer’s treatment of Mrs. Benoit’s condition. Although Mrs. Be-noit’s testimony seems to suggest Dr. Rathmell discussed her problems in greater detail, Mrs. Benoit’s testimony must be considered in light of her mental and physical state on the date of her visit with Dr. Rathmell. Her condition was described by Dr. Rathmell as “toxic,” and Mrs. Benoit was carried into Dr. Rathmell’s office by her husband. Considering Dr. Rathmell’s testimony and Mrs. Benoit’s diminished state of mind, we cannot say the visit to Dr. Rathmell was sufficient to put her on notice of Dr. Archer’s possible negligence.
Defendants also cite the deposition testimony of Ruth Singletary as evidence |fithat Mrs. Benoit was aware of facts sufficient to find she knew or should have known of Dr. Archer’s inappropriate treatment:
Q. She was not referred here by Dr. Archer?
A. No. She was referred by her sister.
Q. And as far as you know, did she ever tell Dr. Archer that she was seeing you?
A. I don’t know.
Q. Did you ever discuss her case with Dr. Archer?
A. No. My notes state that Dr. Archer had increased the medication earlier that day. Her husband was off-the-wall over that, wondered why Dr. Archer upped a dose of medication that wasn’t working.
Q. When you say her husband was off-the-wall about that, what does that mean?
A. He was just very upset. He was very, very upset.
Q. Did you have any response to him or to her about the medication that she was being prescribed and taking from Dr. Archer?
A. I had — I—I encouraged her to get a second opinion after several sessions. When people don’t start getting — when I don’t start seeing improvement after two or three sessions, I encourage them to get back with their physician or see a physician, particularly if their anxieties and depression scales are up — are real high, which hers were. I — I recommended a second opinion on the second appointment — during the second appointment.
Q. What was the date of that, please? A. September 30th.
Q. Of '94?
A. Right. She was still sharing frustrations about the physician. It didn’t make sense to me. I mean if — you know, when people complain about Kroger’s, you wonder, “Why don’t you go to Marker Basket,” I mean, you know. So I — it didn’t make sense to me that she would have continued to be frustrated with a situation and go back to the same practi *1279 tioner. It’s more — there’s more than one intent (sp). Go to | ^someone else.
Q. Did you discuss that with her in making a suggestion that she seek a second opinion?
A. Yes, I did suggest she — my notes stated that I suggested that she seek a second opinion.
Q. Do you recall — did you say something — anything like what you just told us that if you don’t like Kroger’s, go to Market Basket?
A. Probably not. I mean that was just off the top of my head now, but she was continuing — that was the same thing that presented the first time—
Q. Uh-huh (yes).
A. —plus in my mind, I really wondered why an excessive amount of Xa-nax was continuing to be used for what seemed clear to me to be OCD. No, I’m not a physician. If a physician makes one diagnosis and I have something else in mind, the physician rules, you know; but since she was continuing to have distress after some — all these different therapists and after being on that particular drag, which is known to be addictive, for an — a lengthy period of time— her husband was upset, her sister was upset, other family members were upset — it made sense it was time to see a second-get a second opinion.
There is no indication Mrs. Singletary ever informed Mrs. Benoit or her husband that the treatment provided by Dr. Archer was inappropriate or negligent. From the record before us, it appears Ms. Singletary’s advice consisted of suggesting that Mrs. Benoit obtain a second opinion, which she did approximately one month later.
Constructive knowledge sufficient to begin the running of prescription requires more than a mere apprehension that something might be wrong. Griffin v. Kinberger, 507 So.2d 821 (La.1987). Prescription does not ran against one who is ignorant of the fact upon which his or her cause of action is based so long as such ignorance is not willful, negligent, or unreasonable. Id. Thus, even if a malpractice victim is aware that an undesirable condition has developed after the medical treatment, prescription will not run as long as it was reasonable for the plaintiff not to recognize that the [7condition might be related to improper treatment. Griffin v. Kinberger, 507 So.2d 821; Harlan v. Roberts, 565 So.2d 482.
After a thorough review of the record, we find the trial court erred in finding prescription ran against Mrs. Benoit. It is clear from the record, Mrs. Benoit was severely addicted to Xanax, and was in no position to make an informed decision as to treatment rendered to her by Dr. Archer. An indication of Mrs. Benoit’s state of mind during this time period was given by her husband, who testified after the visit with Dr. Rathmell his wife’s only concern was whether or not she would get her medication:
Q. Do you remember anything else that Dr. Rathmel said on that visit?
A. No. That was just the first visit and she rescheduled her, you know, for another visit and as soon as we walked out the door, Pam says, “Well, I’ll never go back to her.”
Q. And why? Did she say why?
A. Yeah. “She wants to take my medicine away.”
Defendants also contend Mrs. Benoit “had knowledge of facts strongly suggestive of the untoward condition or that it may be the result of improper treatment.” We do not agree. The record before us indicates Mrs. Benoit was unable to exercise “reasonable judgment,” and that this inability was due to her addiction to Xanax. Her prolonged “ignoran[ce] of the fact upon *1280 which ... her cause of action” may have been based was “not willful, negligent, or unreasonable.”
We also find additional reasons exist to find prescription did not run in this instance. Plaintiffs allege the continuous treatment by Dr. Archer amounted to a continuing tort, and thus prescription did not begin to run until Dr. Archer last saw Mrs. Benoit and last prescribed her Xanax. The Louisiana Supreme Court in In re Medical Review Panel for Claim of Moses, 00-2643, p. 10, 19-20 (La.5/25/01), 788 So.2d 1173, 1180, 1185-86, discussed in detail the continuing tort rule:
| «We recently held that “for there to be a continuing tort there must be a continuing duty owed to the plaintiff and a continuing breach of that duty by the defendant. 54 C.J.S. Limitations of Actions § 177 (1987).” Crump [v. Sabine River Authority ], 98-2326 at p. 10, 737 So.2d at 728. Rejecting the contention that the continuing breach of duty could consist of the defendant’s failure to remedy the harm caused by the initial tortious conduct, we stated that “the breach of the duty to right a wrong and make the plaintiff whole simply cannot be a continuing wrong which suspends the running of prescription, as that is the purpose of any lawsuit and the obligation of every tortfeasor.” 98-2326 at p. 10, 737 So.2d at 729. An exception, 'however, has been recognized when a special relationship, such as patient-physician or attorney-client, exists between the parties; the continuation of a special relationship offers the possibility of correction of an injury and thus may postpone the running of prescription. 54 C.J.S. Limitations of Actions § 177 (1987). “As long as the patient remains in [the physician’s] care, she could reasonably expect a correction of the diagnosis or treatment, so again, the defendant in a sense continues to be negligent.” Dobbs, supra § 220 at 561.
In Taylor v. Giddens, 618 So.2d 834 (La.1993), we noted the possibility that continued treatment combined with a continued professional relationship could result in a suspension of prescription. We further noted that two appellate cases have recognized this principle, which is based on the fact the continuing relationship is “likely to hinder the patient’s inclination to sue.” 618 So.2d at 843 (citing Trainor v. Young, 561 So.2d 722 (La.App. 2d Cir.), writs denied, 567 So.2d 1124, 1125 (La.1990), and Abrams v. Herbert, 590 So.2d 1291 (La.App. 1st Cir.1991)).
[[Image here]]
A series of radiation treatments negligently administered to a plaintiff who was misdiagnosed with cancer that allegedly resulted in the plaintiffs death was held to be a continuing tort in Winder v. Avet, 613 So.2d 199 (La.App. 1st Cir. 1992), writs denied, 617 So.2d 907 (La. 1983). Similarly, a course of administration of narcotic drugs spanning several years that allegedly resulted in addiction was held to be a continuing tort in Chiasson v. Doe, 618 So.2d 38 (La.App. 3rd Cir.), writ denied, 624 So.2d 1225 (La. 1993).
Another illustration of a course of narcotic drug administration that was held to be a continuing tort is presented in Page v. United States, 729 F.2d 818 (D.C.Cir.1984). Describing the continuing tort concept to mean that “ ‘when a tort involves continuing injury, the cause of action accrues, and the limitation period begins to run, at the time the tortious conduct ceases,’ ” the federal court invoked the continuing tort concept to toll the statutory time limit until the termination of the continued drug |9therapy. 729 F.2d at 821. Noting the difficulty of *1281 pinpointing a single incident in a continuous chain of tortious activity as the cause of significant harm and stressing the cumulative effect of the conduct as actionable, the court stated:
We view the injury claimed by Page as gradual, resulting from the cumulative impact of years of allegedly tor-tious drug treatment. To us it seems unrealistic to regard each prescription of drugs as the cause of a separate injury, or as a separate tortious act triggering a new limitation period. Page charges precisely the sort of continuous conduct accreting physical and mental injury that justifies characterization as a continuing tort. Re-sultingly, the cause of action Page stakes on continuous drug treatment did not accrue, and the statutory limitations did not come into play, until the allegedly tortious conduct came to a halt in 1980.
729 F.2d at 822-23. The Page court, however, distinguished the continuing tort doctrine it invoked based on the ongoing tortious conduct from the discovery rule that applies when a plaintiffs injury continues or manifests after the defendant’s tortious conduct ceases. 729 F.2d at 821 n. 23.
A common characteristic shared by Winder, Chiasson, and Page, is that they present a plaintiff who was harmed as a result of the cumulative effect of a course of negligent treatment, not by a single act of malpractice. This characteristic was also present in both Wilson [v. Hatzman (La.App. 4 Cir. 6/5/1979), 373 So.2d 204] and Bustamento [v. Tucker (La.1992), 607 So.2d 5321 the two cases discussed above involving occupational disease and intentional infliction of emotional distress, respectively, in which a continuing tort was found to exist. This characteristic clearly is lacking in this case; neither cumulative damage to plaintiff, nor continuing treatment by defendant are present; rather, this case involves a single act of medical malpractice. (Footnotes omitted.)
Plaintiffs assert she was harmed as a result of the cumulative effect of a course of negligent treatment (the prescribing of Xanax), not by a single act. The record indicated Mrs. Benoit’s last visit to Dr. Archer was on November 14, 1994, during which he continued her prescription for Xanax.
Further, plaintiffs cite this court’s decision in Chiasson v. Doe, 618 So.2d 38 (La.App. 3 Cir.), writ denied, 624 So.2d 1225 (La.1993) as applicable to the facts of this case. In Chiasson, the plaintiff filed a medical malpractice claim alleging she was |intreated for severe headaches with narcotics for a period of years, resulting in addiction. Defendants filed an exception of prescription, alleging plaintiff had actual or constructive knowledge more than one year prior to the filing of the complaint, resulting in an untimely law suit. The trial court held the plaintiffs claims were barred by prescription. Plaintiff contended on appeal the actions of her physicians amounted to a continuing tort. This court found as follows:
In order to allege continuing tort, a plaintiff must allege both continuous action and continuous damage. In the case sub judice, plaintiffs allege that Dr. Marler, as the primary treating physician, continued to treat Mrs. Chiasson’s severe headaches between 1981 and 1987 with narcotic medications, and that in 1984, Dr. Harper was brought in by Dr. Marler to help detox Mrs. Chiasson from the narcotic drugs to which she had become addicted. After detoxification, she was placed once again on the narcotic medications by both doctors and she again became addicted to the *1282 drugs. On at least forty-two (42) occasions between 1983- — 1987, she was treated in the emergency room of Our Lady of Lourdes Regional Medical Center in Lafayette under the supervision of both Drs. Marler and Harper, where she was injected with narcotic drugs.
As a result of the continuing treatment by Dr. Marler and Dr. Harper, Mrs. Chiasson suffered the continuing damage of addiction which resulted in not only having to go through withdrawal therapy, but also causing a deterioration to her hips and thighs, due to approximately 250 injectables she was receiving in a home therapy program supervised by the doctors. Mrs. Chias-son also attempted suicide by slashing her wrist causing extensive damage to her tendons and nerves.
Having found that plaintiffs sufficiently alleged facts which demonstrate both continuous action and continuous damage, we reverse the trial court and hold that prescription did not begin to run until after the last hospitalization of September, 1987 when Mrs. Chiasson was no longer under the treatment of Drs. Harper and Marler. Plaintiffs have therefore timely filed their lawsuit and their claims of negligence against all defendants have not prescribed.
Chiasson v. Doe, 618 So.2d at 41.
Judge Guidry concurred in the Chiasson decision, and gave additional reasons for reversing the trial court:
It is well settled that in matters involving legal malpractice, | ^prescription is suspended under the civilian doctrine of contra non valentum until termination of the attorney-client relationship. Olivier v. National Union Fire Insurance Company, 499 So.2d 1330 (La.App. 3rd Cir.1986); Milligan v. LaCaze, 509 So.2d 726, 509 So.2d 729 (La.App. 3rd Cir.1987), writ denied, 512 So.2d 440 (La.1987); Blanchard v. Reeves, 469 So.2d 1165 (La.App. 5th Cir.1985), writ denied, 476 So.2d 347 (La.1985); Brand v. New England Insurance Company, 576 So.2d 466 (La.1991). There appears to be no justifiable reason why this principle should not be equally applicable in cases involving medical malpractice where the physician-patient relationship continues despite the fact that the patient, during the course of treatment, receives opinions from other physicians that the treatment being administered by the treating physician is inappropriate. To hold otherwise would impose a greater burden of medical knowledge on the patient than that possessed by the treating physician.
Id., 618 So.2d at 41.
Defendants cite another third circuit ease, Dufour v. Mayeux, 95-678 (La.App. 3 Cir. 11/2/95), 664 So.2d 577, writ denied, 95-2880 (La.2/2/96), 666 So.2d 1101, as “clearly set[ting] forth the principals applicable here.” In Dufour, the plaintiff alleged through the fault and negligence of her doctor she became wrongfully addicted to the prescription pain drugs Fiorinal and Fiorinal with codeine. The trial court maintained the doctor’s exception of prescription. The trial court held the prescriptive period began to run on October 12, 1990, the date the doctor last saw plaintiff and last prescribed her Fiorinal. Plaintiff contended prescription should have commenced on the date upon which she first obtained the requisite knowledge of the doctor’s alleged wrongdoing, November 7, 1990. We affirmed the trial court for the following reasons:
The plaintiffs are required to allege continuing action on the part of Dr. Mayeux and continuing damage resulting therefrom. The final act taken by Dr. May-eux in his lengthy treatment history of Barbara was on October 12, 1990. *1283 Therefore, plaintiffs have failed to show that Dr. Mayeux’s actions extended beyond October 12, 1990. We expressly decline to impose upon the physician an affirmative duty to inform his patient in writing that the physician-patient relationship has been terminated.
Id., 664 So.2d at 584.
We note in the present case, Dr. Archer last saw Mrs. Benoit and prescribed her Xanax on November 14, 1994. Suit was filed on November 13, 1995. Therefore, under the reasoning of Dufour, the suit was timely filed. We are also satisfied the pleadings and deposition testimony in the record supports a finding that when Dr. Archer reissued Mrs. Benoit a prescription for Xanax on November 14, 1994, he owed her a continuing duty; and nothing in the record establishes in this instance that this duty ceased during the course of his treatment of her condition, or that his alleged negligent conduct ended prior to this date. The jurisprudence supports the legal conclusion that prescription did not begin to run against plaintiffs’ claim until the date of her last visit, the date Dr. Archer issued the last Xanax prescription to treat her condition and the date his final act of malpractice occurred.
DECREE
For the foregoing reasons, the judgment of the trial court maintaining defendants’ exception of prescription is reversed. All costs of this appeal are assessed against defendants.
REVERSED.
AMY, J., dissents.

. Plaintiffs contend the medical review panel found Dr. Archer failed to comply with the appropriate standard of care and Mrs. Benoit was injured as á result. Defendants note the decision of the panel is not in the record, and "if it were, it would show that the panel found that Dr. Archer failed to follow the standard of care in the keeping of his records and Pam Benoit was damaged only for the six months it took her to be weaned from Xanax.” Because the only question before us concerns the running of prescription, resolution of this factual conflict is not necessaiy at this time.