618 So.2d 834 (1993)
Frank H. TAYLOR, et al.
v.
Dr. William R. GIDDENS and Dr. Jack E. Carlisle.
No. 92-C-3054.
Supreme Court of Louisiana.
May 24, 1993.
*836 Garic Kenneth Barranger, Covington, Edmund Mazyck Thomas, Shreveport, for applicant.
Robert G. Pugh, Jr., Pugh, Pugh & Pugh, Samuel W. Caverlee, Cynthia C. Anderson, Cook, Yancey, King & Galloway, Shreveport, for respondent.
ORTIQUE, Justice.[1]
We granted writ to determine whether survival actions and/or wrongful death actions are governed by the prescriptive period set forth in LSA-R.S. 9:5628.[2] Plaintiffs, the widower and children of an alleged medical malpractice victim, filed their petition for the appointment of a medical review panel approximately three and one-half years after the occurrence of the tortious act, but within one year of the victim's death. The defendants, the internist and radiologist who failed to diagnose the victim's esophageal cancer, filed exceptions of prescription urging the survival and wrongful death actions had prescribed under both the one and the three year time limitations of LSA-R.S. 9:5628. Their exceptions were sustained by the trial court and affirmed by the court of appeal. After concluding that LSA-R.S. 9:5628 provides the prescriptive period for survival actions but does not provide the prescriptive period for wrongful death actions, we affirm in part, reverse in part and remand. The commencement and running of the prescriptive period for the wrongful death action is controlled by the one year liberative period applicable to delictual actions, LSA-C.C. art. 3492, and the action is available to the certain beneficiaries named in LSA-C.C. art. 2315.2 (formerly named in LSA-C.C. art. 2315).

*837 I.
Dr. William R. Giddens, an internist at The Diagnostic Clinic in Shreveport, was initially visited by Connolly Logan Taylor ("Mrs. Taylor") in June, 1982. She complained of dysphagia, a difficulty in swallowing solids. Dr. Giddens referred her to the radiologists at Schumpert Memorial Medical Center ("Schumpert") for upper GI x-rays. He allegedly gave her a note to give to the radiologist with "dysphagia, upper GI" written on it and instructed her to inform the radiologist about her dysphagia. While scheduling her x-ray examination, Dr. Giddens attempted to contact the radiologist who would have the x-ray assignment. Even though he did not speak with the radiologist, he expected Mrs. Taylor's esophagus to be x-rayed.
Dr. Jack E. Carlisle, a radiologist at Schumpert, x-rayed Mrs. Taylor. He allegedly did not receive Dr. Giddens' note and was not alerted by Mrs. Taylor to the dysphagia when he took her history.[3] The GI series which Dr. Carlisle performed included a fluoroscopic examination of the esophagus, stomach and duodenum, with films of the gastroesophageal junction.[4] He did not x-ray her esophagus. As per routine practice, Dr. Giddens received only the radiologist's report which indicated the esophagus was normal, although the x-rays were available for his review at Schumpert. When he telephoned Dr. Carlisle to discuss the x-ray examination, it was Dr. Carlisle's day off. Consequently, without discussing the matter with the radiologist, Dr. Giddens informed Mrs. Taylor that her esophagus was normal and diagnosed her as having a nervous esophagus. He informed her that an esophagoscopy would be necessary if her symptoms continued.
After the x-rays were taken, Mrs. Taylor told her husband, Frank Taylor ("Mr. Taylor"), that the x-rays were "botched-up." The wife of the mayor of Shreveport had arrived for tests at Schumpert and was given VIP treatment, delaying Mrs. Taylor's appointment. She also told her husband Dr. Giddens' diagnosis was ridiculous. He said she did not believe the diagnosis.
Mrs. Taylor's symptoms abated and the family took a month vacation to the Bahamas. Upon their return to Shreveport, Mrs. Taylor's dysphagia worsened. While perusing a medical book at a bookstore, she diagnosed herself as having esophageal cancer. Rather than return to Dr. Giddens, she went to a gastroenterologist, Dr. Thomas V. Allen. Due to the persistence of the dysphagia and her previous negative x-rays, he performed two diagnostic tests, an esophageal motility, which showed esophageal spasms, and an esophagoscopy. The esophagoscopy showed a mass in the lining of the esophagus with a narrowing in the opening of the esophagus. Dr. Allen took two biopsies, the washing showed a class IV pap smear and the pinch showed a *838 squamous type malignant tumor.[5]
Mr. Taylor, a businessman and a Tulane Law School graduate, had telephoned Dr. Giddens on September 23, 1982, and informed him that his wife had been reading medical books and, due to her research on the subject and the persistence of her symptoms, suspected that she might have cancer of the esophagus. Dr. Giddens indicated he would contact Drs. Wilder, Allen or McGinty to schedule an esophagoscopy. Consequently, Dr. Giddens was surprised to discover on September 27, 1982, that Mrs. Taylor had been esophagoscoped by Dr. Allen and the biopsy was positive. Dr. Giddens testified that,
[he] thought [he] was the doctor on the case, and [he] wasn't the doctor on the case because they had Dr. Allen [perform the esophagoscopy] without [his] knowledge. Nevertheless, [he] called to talk and speak with Mr. Taylor, her husband, and explain that [he] regretted to hear the news and [he] couldn't explain the situation, but that [he] was available if [he] could be of any help and Mr. Taylor told [him] at that time [his] negligence had cost his wife her life, and so hearing that, [he] assumed that he was dismissed from the case and could only stand by and wait.[6]
Mr. Taylor admits that he knew in September 1982 that Dr. Giddens reported his wife's esophagus was normal and Dr. Allen diagnosed cancer of the esophagus. He testified that her primary treating physician was Dr. Frazier at St. Luke's in Houston, Texas, and her nutritionist was Dr. Dudrick, also at St. Luke's.[7] He also admits he went to a medical malpractice attorney on May 11, 1984, and "by the time I went to see him, I knew there had been a foul-up."[8] The attorney urged him to file *839 suit prior to Mrs. Taylor's death but he said he "lost interest" in the suit and got caught up in keeping Mrs. Taylor alive. He did not return to the attorney until after his wife's death.
Mrs. Taylor died on January 9, 1985. In February, 1985, Mr. Taylor questioned the internist and radiologist for the first time concerning the basis for their failure to diagnose the cancer. He learned that Mrs. Taylor's esophagus had been examined, but it had not been x-rayed. Thereafter, Mr. Taylor and Mrs. Taylor's children filed a petition for the appointment of a medical review panel with the Commissioner of Insurance on January 8, 1986, pursuant to the Medical Malpractice Act, LSA-R.S. 40:1299.41 et seq, naming the internist and radiologists as defendants.
The defendants filed peremptory exceptions of prescription against the petition in district court, claiming the actions had prescribed under both the one and the three year time limitations set forth in LSA-R.S. 9:5628. The plaintiffs amended their petition, but the trial court sustained the exception. The plaintiffs filed a second amending petition alleging the defendants withheld information concerning the basis for the failure to diagnose. Defendants renewed their exceptions and they were sustained by the trial court. The appellate court affirmed, 607 So.2d 878 (La.App.2d Cir.1992), holding that the language of LSA-R.S. 9:5628 is unambiguous and provides no exception for wrongful death and/or survival actions brought beyond the statute's one year and three year prescriptive periods, and that the doctrine of contra non valentem is not factually supported in this case and, nevertheless, could not extend the malpractice action beyond the three year prescriptive period limit. We granted certiorari, 612 So.2d 43 (La. 1993), to determine whether the provisions of LSA-R.S. 9:5628 set forth the prescriptive period for survival and/or wrongful death actions having a genesis in medical malpractice.

II.
The appellate courts of this state are in conflict as to whether LSA-R.S. 9:5628 applies to actions for survival and/or wrongful death. The Second and Fourth Circuits hold that the broad language of LSA-R.S. 9:5628 applies to those actions, while the First and Third Circuits hold the statute is a general law that does not specifically provide for the two actions and therefore must yield to the specific provisions of LSA-C.C. art. 2315, now arts. 2315.1 (survival) and 2315.2 (wrongful death). See Dunn v. North Community Hosp., 545 So.2d 1267 (La.App. 2d Cir.1989), writ den., 550 So.2d 633 (La.1989) [both actions]; Minor v. Casten, 521 So.2d 465 (La.App. 4th Cir.1988) [both actions]; Gover v. Bridges, 486 So.2d 1117 (La.App. 2d Cir.1986), aff'd on other grounds, 497 So.2d 1364 (La.1986) *840 [wrongful death only]; Giroir v. South Louisiana Medical Center, 453 So.2d 949 (La.App. 1st Cir.1984), aff'd in part, rev'd in part, on other grounds, 475 So.2d 1040 (La.1985) [both actions]; Lambert v. Michel, 364 So.2d 248 (La.App. 3d Cir.1978), writ den. ("the result is correct"), 366 So.2d 917 (La.1979) [wrongful death action only; dicta addressed survival actions; held: providing that the victim's action had not prescribed by the date of death, the death]. The Fifth Circuit has not entertained the issue.
The polemic statute provides in pertinent part as follows:
§ 5628. Actions for medical malpractice
A. No action for damages for injury or death against any physician, ..., whether based upon tort, or breach of contract, or otherwise, arising out of patient care shall be brought unless filed within one year from the date of the alleged act, omission, or neglect, or within one year from the date of discovery of the alleged act, omission, or neglect; however, even as to claims filed within one year from the date of such discovery, in all events such claims shall be filed at the latest within a period of three years from the date of the alleged act, omission, or neglect.
The statute's language directs that its provisions contain the prescriptive period for all of the victim's medical malpractice claims and for existing correlative actions, such as the victim's spouse and child[ren]'s action for loss of consortium. The reference in the statute to actions for death seems to encompass all death actions, survival and wrongful death, having a genesis in medical malpractice.
Although both actions arise from a common tort, survival and wrongful death actions are separate and distinct. Guidry v. Theriot, 377 So.2d 319 (La.1979). Each right arises at a different time and addresses itself to the recovery of damages for totally different injuries and losses. Id. The survival action comes into existence simultaneously with the existence of the tort and is transmitted to beneficiaries upon the victim's death and permits recovery only for the damages suffered by the victim from the time of injury to the moment of death. Id. It is in the nature of a succession right. Comment, Wrongful Death: Prescription? Peremption? Confusion! 39 La.L.Rev. 1239, 1249 (1979). On the other hand, the wrongful death action does not arise until the victim dies and it compensates the beneficiaries for their own injuries which they suffer from the moment of the victim's death and thereafter. Guidry v. Theriot, supra. Wrongful death damages compensate beneficiaries for their own injuries. 39 La. L.Rev. 1239, supra at 1249.
Even though the malpractice is not discovered, the victim's medical malpractice claims and the victim's family's claims, such as for loss of consortium, exist from the inception of the tortious act, omission or neglect. Likewise, the survival action, which is a derivative of the malpractice victim's action, is linked to the inception of the tortious act, omission or neglect. The action is based upon the victim's right to recovery being transferred by operation of law to the beneficiary. See Comment, PrescriptionWhat You Don't Know Can Hurt YouLouisiana Adheres To A Three Year Limit On The Discovery Rule 58 Tul.L.Rev. 1547, 1249 (1984). The action is dependent upon the victim having a viable malpractice action on the date of death and must be filed within one year of the malpractice victim's death but, nevertheless, within the three year outward limit of LSA-R.S. 9:5628.[9] Thus, the provisions of LSA-R.S. 9:5628 gives malpractice victims and claimants and survival action claimants a definitive period in which to file suit.
In contrast, the wrongful death action does not necessarily come into existence simultaneously with the malpractice action or even come into existence while the victim's *841 malpractice action is viable. Consequently, if LSA-R.S. 9:5628 controlled the prescriptive period for wrongful death actions, a certain class of wrongful death claimants would be time-barred from filing suit before their cause of action even arose. The statute would not equally affect all medical malpractice wrongful death claimants or treat them the same. See Crier v. Whitecloud on reh'g, 496 So.2d 305 (La. 1986). Wrongful death claimants whose malpractice victim died within the prescriptive period would be allowed to seek damages, while those whose malpractice victim died after the expiration of the malpractice action prescriptive period would be denied the right to seek damages. Their remedy to address their civil wrong would have been eliminated prior to the accrual of their cause of action. Such a result is intolerable, as it discriminates among wrongful death tort claimants.
Though it may have its genesis in an act of malpractice, a wrongful death action is not a malpractice action. From its inception, the action exists only in favor of the victim's beneficiaries. Guidry v. Theriot, supra. Therefore, it is not controlled by the prescriptive period for medical malpractice actions. The reference to actions for death in LSA-R.S. 9:5628 applies solely to survival actions as they are derivative of the malpractice victim's action. Further, wrongful death actions are not dependent upon the victim having a viable malpractice action. The date of the malpractice victim's death determines when the prescriptive period commences running, as that is the date the claimants are injured. The date of the discovery of the malpractice by the victim or the claimants prior to the victim's death, is not consequential.
The determination that the prescriptive period for wrongful death actions arising from acts of medical malpractice are not within the scope of LSA-R.S. 9:5628, does not alter the affect that the Medical Malpractice Act, LSA-R.S. 40:1299.41 et seq, has on wrongful death actions. The actions continue to be governed and procedurally controlled by the provisions of the Act. Rather, because LSA-R.S. 9:5628 does not provide the prescriptive period for wrongful death actions, the commencement and running of its prescriptive period is controlled by the one year liberative period applicable to delictual actions, LSA-C.C. art. 3492, and the action is available to the certain beneficiaries named in LSA-C.C. art. 2315.2 (formerly named in LSA-C.C. art. 2315).
This statutory construction and interpretation satisfies the State's interest in protecting the family unit which is at the core of the wrongful death statute. Comment, Wrongful Death in Louisiana: Too Often A "Cause" Without A "Right" 41 La. L.Rev. 954 (1981). It also prevents the loss of the wrongful death action to a certain class of victims (claimants), an action which was given to all wrongful death victims (claimants) by Acts of 1884, No. 71, and which have been considered since 1884 as a compensable injury and a vested property right. See LSA-C.C. arts. 2315, 2315.2; Guidry v. Theriot, supra; 39 La.L.Rev. 1239, supra at 1241; 58 Tul.L.Rev. 1547, supra 1248. Cf. Crier v. Whitecloud, on reh'g, supra, [when an injury occurs which gives the injured party a cause of action, that cause of action becomes a vested property right which is protected by the guarantee of the due process clause; when a person does not file suit within the prescriptive period, the person has no cause of action and no vested property right]. Additionally, this construction prevents the aura of unconstitutional restriction of access to the courts to a certain class of wrongful death claimants and equally protects the claimant's property interest by insuring they have a period in which to bring their cause of action after it accrues. LSA-Const. Art. I, § 3, Art. I, § 22[10]. See *842 generally Crier v. Whitecloud, on reh'g, supra; Everett v. Goldman, 359 So.2d 1256 (La.1978); Valentine v. Thomas, 433 So.2d 289, 292 (La.App. 1st Cir.1983) ["Equal protection of the law means that state laws must affect alike all persons similarly situated."], writ den., 440 So.2d 728 (La.1983).
The interpretation that wrongful death actions are not within the ambit of LSA-R.S. 9:5628 also balances the interest of society, by allowing that class of tort claimants an opportunity to recover damages from the tortfeasor, against the interest of the public in controlling medical costs, since wrongful death actions have limited types of damages and, generally, the causal connection declines as the period between the alleged act of malpractice and the date of death lengthens.
Therefore, the plaintiffs' wrongful death action, filed within the one year period set forth in LSA-C.C. art. 3492, was timely filed. However, the plaintiffs' survival action, controlled by the prescriptive periods set forth in LSA-R.S. 9:5628 and filed three and one-half years after the tortious act, has prescribed on its face.

III.
Prescription runs against all persons unless exception is established by legislation. LSA-C.C. art. 3467. Nevertheless, plaintiffs claim that prescription was suspended and did not run on their survival action because defendants withheld information concerning the basis of their failure to diagnose, i.e., plaintiffs claim they were not informed that Mrs. Taylor's esophagus was not x-rayed in June, 1982.
Despite the express statutory provision that prescription runs against all persons unless exception is established by legislation, the doctrine of contra non valentem was juridically created as an exception to the general rule, suspending the running of prescription in four general categories. Plaquemines Parish Com'n Council v. Delta Development Co., Inc., 502 So.2d 1034, 1054 (La.1987); Crier v. Whitecloud, on orig hrn'g, 486 So.2d 713 (La.1986), aff'd on rhn'g, 496 So.2d 305 (La.1986). Only the third and fourth categories are relevant to this case. The fourth category, known as the "discovery rule," was expressly made inapplicable to medical malpractice actions filed more than three years after the date of the act, omission or neglect. Rajnowski v. St. Patrick's Hospital, 564 So.2d 671 (La.1990); Hebert v. Doctors Memorial Hospital, 486 So.2d 717 (La. 1986); Crier v. Whitecloud, on rehn'g, supra; Chaney v. State Through the Dept. of Health and Human Resources, 432 So.2d 256 (La.1983); 58 Tul.L.Rev. 1547, supra at 1248. Therefore, as this suit was filed more than three years after the act of malpractice, it is unnecessary to determine the date prescription commenced running on Mrs. Taylor's malpractice action because the discovery rule can not be used to save plaintiffs' survival action.
The applicability of the third category of contra non valentem, where the health care provider himself has done some act effectually to prevent the victim from availing himself of his cause of action for medical malpractice, has been confronted by this court in three cases in recent years. See Rajnowski v. St. Patrick's Hospital, supra; Whitnell v. Menville, 540 So.2d 304 (La.1989); and Gover v. Bridges, 497 So.2d 1364 (La.1986). However, those cases do not expressly declare that the third category of contra non valentem applies to medical malpractice cases to suspend or interrupt prescription. See Rajnowski v. St. Patrick's Hospital, supra (Dennis, J., concurring).
Nevertheless, as in Rajnowski, Drs. Giddens and Carlisle did not prevent Mrs. Taylor or plaintiffs from learning of or availing themselves to her medical malpractice cause of action or their survival action. Since the cancer was diagnosed in September, 1982, the facts were apparent and discoverable. Possession of the x-rays was *843 tendered to Mr. Taylor in May, 1984. The physicians did not refuse to discuss the facts surrounding the malpractice action and, indeed, fully explained the factual circumstances to Mr. Taylor when questioned in February, 1985.
The allegations of fraud against the physicians set forth in the second amending petition and supporting affidavit, and the factual support on record, do not rise to the level necessary to trigger the application of the third category of contra non valentem. Therefore, without expanding on jurisprudence of this court on the third category, we find neither the discovery rule nor the ill practices contra non valentem theories can be used to save plaintiffs' survival action from the prescriptive limitations of LSA-R.S. 9:5628.

IV.
Plaintiffs also argue that Dr. Giddens continually treated Mrs. Taylor through the duration of her illness and on the basis of his continual treatment and their continued professional relationship, prescription was suspended until her death, citing Trainor v. Young, 561 So.2d 722 (La.App. 2d Cir.1990), writ. den., 567 So.2d 1124, 1125 (La.1990), and Abrams v. Herbert, 590 So.2d 1291 (La.App. 1st Cir.1991) [the basis for interrupting prescription is the premise that the professional relationship is likely to hinder the patient's inclination to sue]. The record, however, including the depositions of Dr. Giddens and Mr. Taylor, belies the plaintiffs' representations of the extent of Mrs. Taylor's professional relationship with Dr. Giddens. The deposition of the physician indicates that, although he attended Mrs. Taylor during her terminal illness, "[he thought] it was common knowledge that Mrs. Taylor and Mr. Taylor's doctors were actually the Houston doctors, and [he] was trying to do what they said, and they wanted us to give her iron and so forth, and we did it." The deposition of Mr. Taylor, taken before the case emphasized the issue of the continuing nature of the patient/physician relationship, accords this view. See note 7, supra.
Since the record fails to evince that the malpractice victim had more than a perfunctory patient-physician relationship with Dr. Giddens, we decline to address the issue of suspension of prescription based upon the patient's continual treatment by the physician tortfeasor.
Plaintiffs' final argument is the unconstitutionality of the statute of limitation in medical malpractice cases. We decline to consider this argument also because plaintiffs have not complied with the prerequisites that the constitutionality of a statute must first be questioned in the trial court and the Attorney General must be served as he is an indispensable party, LSA-C.C.P. art. 1880. Lemire v. New Orleans Public Service, Inc., 458 So.2d 1308 (La.1984).

DECREE
For the reasons assigned, the judgment sustaining the peremptory exceptions is affirmed as to the survival action and reversed as to the wrongful death action. The case is remanded for further proceedings. The parties are to bear their own costs.
AFFIRMED IN PART, REVERSED IN PART AND REMANDED.
LEMMON, J., concurs and assigns reasons.
DENNIS, J., concurs for the reasons assigned by LEMMON, J.
MARCUS, J., concurs in part, dissents in part and assigns reasons.
LEMMON, Justice, concurring in part.
La.Rev.Stat. 9:5628 provides two prescriptive periods and one peremptive period. The normal period of prescription is one year from the act, omission or neglect constituting the malpractice. The second period of prescription, which is one year from discovery of the act, omission or neglect, incorporates the discovery rule of the fourth category of the doctrine of contra non valentem enunciated in Corsey v. State of La., Department of Corrections, 375 So.2d 1319 (La.1979). The three-year *844 period of peremption places the outside limits on the application of the fourth category of contra non valentem, even if the cause of action was not discovered until more than three years after the act, omission or neglect.[1]
Since the period of peremption in La.Rev. Stat. 9:5628 was adopted as a limitation on the discovery rule contained in the statute, the limitation must be construed to ban after three years any suit on a cause of action that arose at the time of the act, omission or neglect. A cause of action for wrongful death damages does not arise at the time of the act, omission or neglect. The cause of action in favor of the tort victim's survivors to recover their own damages does not come into existence until the tort victim's death. If plaintiffs had asserted this wrongful death action prior to the tort victim's death, they would have been met with an exception of prematurity.
While La.Rev.Stat. 9:5628 bars any "action for damages for injury or death " (emphasis added) after three years from the act, omission or neglect, the operation of the statute must be limited to causes of action for the tort victim's damages which arose at the time of the act, omission or neglect, and not to causes of action for the tort victim's survivors' own damages which arose after that time.[2]
MARCUS, Justice (concurring in part and dissenting in part).
I concur with the majority opinion insofar as it sustains the exception of prescription as to the survival action; however, I dissent from the holding that the wrongful death action is not prescribed. La.R.S. 9:5628 clearly provides "no action for damages for injury or death" shall be brought unless filed within one year of discovery of the alleged act or at the latest within three years from the alleged act. (emphasis added). By using the word "death," the legislature must have intended to include the wrongful death action, since it is axiomatic that the alleged victim of malpractice could not bring an action for his own death. Accordingly, I am unable to say a suit for wrongful death arising from medical malpractice is not an action for death as contemplated by La.R.S. 9:5628. Rather, I would view La.R.S. 9:5628 as the specific statute to be controlling over the general pronouncement of La.Civ.Code art. 2315.2. For these reasons, I would affirm the decision of the court of appeal's holding that La.R.S. 9:5628 is unambiguous and provides no exception for wrongful death and/or survival actions brought beyond the statute's three year prescriptive period.
NOTES
[1] Pursuant to Rule IV, Part 2, § 3, Hall, J. was not on the panel which heard and decided this case. See footnote in State v. Barras, 615 So.2d 285 (La.1993).
[2] The two amendments to LSA-R.S. 9:5628 since 1982 are not relevant to this case. The statute presently provides as follows:

§ 5628. Actions for medical malpractice
A. No action for damages for injury or death against any physician, chiropractor, dentist, psychologist, hospital duly licensed under the laws of this state, or community blood center or tissue bank as defined in R.S. 40:1299.41(A), whether based upon tort, or breach of contract, or otherwise, arising out of patient care shall be brought unless filed within one year from the date of the alleged act, omission, or neglect, or within one year from the date of discovery of the alleged act, omission, or neglect; however, even as to claims filed within one year from the date of such discovery, in all events such claims shall be filed at the latest within a period of three years from the date of the alleged act, omission, or neglect.
B. The provisions of the Section shall apply to all persons whether or not infirm or under disability of any kind and including minors and interdicts.
[3] Dr. Carlisle testified in deposition that Mrs. Taylor came to him with a request for a GI series which indicated she wanted to know if she had a peptic ulcer. He did not "remember anything about the conversation" he had with Mrs. Taylor concerning her history interview because five years had elapsed between the x-ray examination and the deposition. He testified that if she had told him about the dysphagia, he would have taken x-rays of her esophagus without prior orders from Dr. Giddens and he would not have used ordinary barium. Instead, he would have used the thicker barium solution. He testified that he did not x-ray the esophagus since "there was no evidence of dysphagia on the ... request slip, and [he] apparently did not get a history of dysphagia from the patient," since the results of the fluoroscopy examination did not warrant it and since an esophagogram was not ordered. Dr. Carlisle stated that the first time he spoke with Dr. Giddens about Mrs. Taylor's x-ray examination was after she had the esophagoscopy by Dr. Allen.
[4] Dr. Thomas V. Allen, the gastroenterologist who diagnosed Mrs. Taylor's cancer, testified that at Schumpert,

Upper GI series ... usually means a barium study where the patient drinks barium that looks at the stomach and the first part of the small intestine, the duodenum. At least that what it means to me. Barium swallow means patient (sic) drinks barium, you watch it from when they first swallow it at the upper esophagus in the back of the throat down to where it reaches the stomach. Let me point out again that is not a strict criteria. It tends to vary some. It's certainly a matter of semantic in my opinion. You might go to another hospital and it might not quite mean that ...
[5] Dr. Allen testified that if x-rays had been taken of the esophagus in June, 1982, they "probably would have shown something," but he did not "think that it would have shown" what the September, 1982 x-rays revealed. In his opinion, a patient with esophageal cancer has a very poor prognosis. Consequently, whether the three month delay in diagnosis of Mrs. Taylor's condition "made a significant difference is open to some real question in my mind."
[6] Relative to the two telephone conversations Frank Taylor had with Dr. Giddens, he testified in deposition as follows:

Q. Right. My question was, you recited this to Dr. Giddens when you talked to him on the phone?
A. Yes, I did, just as he said.
Q. Did you also state to Dr. Giddens that he and Dr. Carlisle had missed their diagnosis of cancer and that was going to result in the death of your wife?
A. I did say something like that. I don't remember if I included Carlisle. I don't believe I even knew about Carlisle at that time.
Q. Did you say to Dr. Giddens that he had missed a diagnosis and this could cause the death of your wife?
A. Yes.
Q. Did Dr. Giddens ever refuse to talk to you about the problem?
A. Never did, no.
[7] In deposition, Mr. Taylor described Dr. Giddens' treatment of Mrs. Taylor throughout her last illness as follows:

Q. Dr. Giddens treated Connolly throughout her last illness up through her death?
A. Well, we had an arrangement where all she needed was morphine and so he would prescribe the morphine and I administered it.
Q. What medical needs she had, Dr. Giddens took care of it for her?
A. Well, you have to understand
Q. Well, I'm just trying to
A. You know, we were going down there on a monthly basis. She didn't really have any needs. We were running tests. We would go into the lab at Schumpert and they would do an SMA or whatever you call that, and then I would read that information to Dudrick's guys and they would tell me what to do, and it worked, this outpatient program.
Q. But medically, whatever she needed during her last illness was provided by Dr. Giddens?
A. I guess maybe he would have, but there just wasn't anything. When she died, it was in Houston. We were there for the last course of chemotherapy. There was just a six course program and she got pneumonia.
[8] Mr. Taylor testified in deposition as follows:

Q. But you thought when you first went to see him, somebody had fouled up?
A. Yes.
Q. When did you first reach the conclusion in your mind that somebody had fouled up?
A. I don't know. You see, because the fact that there had been missed (sic) in the first episode, you know. It didn't carry any weight with me. I mean we got in such a hurry and everything after September, after it was found. I really didn't stop to think about it.
Q. It didn't cross your mind that there was a foul-up?
A. No, I couldn't care. You know, it's kind of like priorities.
Q. Well, after September when do you think it first developed in your mind that you thought somebody had fouled-up?
A. I don't think it came to my mind until probably, oh, afterafter that operation in May [1984], that the metastasis was discovered.
* * * * * *
Q. And it was at that pointwas that the first time it crossed your mind there had been a foul-up by Dr. Giddens and Dr. Carlisle?
A. Well, subsequent to that it started mattering, because then Connolly's chance of survival seemed much less to me, and I started thinking of things.
* * * * * *
Q. What type of foul-up did you believe there had been?
A. Well, it turned out that Connolly had cancer and she had been diagnosed to be free. Somewhere between there, there is a foul-up. At the same time, as a matter of fact, when I took these x-rays, when I looked at them and I didn't see a single x-ray of her esophagus in there from the June group, and then you got to September and you saw it on the screen.
Q. This is when you took them from Schumpert?
A. With us, yes.
Q. In May of '84?
A. Yes, ...
Q. Did anyone tell you that Dr. Carlisle had been guilty of medical malpractice? I'll ask the same question Mr. Cook just asked you?
A. No. Troy Bain [the malpractice attorney Mr. Taylor consulted in May, 1984] told me that he thought that there was a cause of action. That is different from saying that someone is guilty.
[9] The death of the malpractice victim does not create a window which would allow survival action claimants to stack another prescription statute onto the periods set forth in LSA-R.S. 9:5628.
[10] In Crier v. Whitecloud, on rehn'g, supra, this court noted that there is no analogous provisions to LSA. Const., Art. I, § 22, in the United States Constitution. Article I, § 22 provides as follows:

All courts shall be open, and every person shall have an adequate remedy by due process of law and justice, administered without denial, partiality, or unreasonable delay, for injury to him in his person, property, reputation, or other rights.
In Crier, 496 So.2d at 310, we interpreted the Article to be a mandate to the judiciary of the state rather than a limitation on the legislature.
[1] Assertion of a cause of action that is discovered between two and three years after the act, omission or neglect is also limited by the prescriptive period of one year from the date of discovery.
[2] A tort victim's own cause of action arises upon the occurrence of the act, omission or neglect. If the tort victim dies before asserting that cause of action, La.Civ.Code art. 2315.1 authorizes designated beneficiaries to assert the action to recover the tort victim's damages. Because the cause of action to recover these damages came into existence at the time of the act, omission or neglect, the three-year period applies to the survival action.