707 So.2d 1380 (1998)
Mary Vivian QUIBODEAUX, et al., PlaintiffsAppellants,
v.
MEDICAL CENTER OF SOUTHWEST LOUISIANA; Hamilton Medical Center; Marc LaPointe, M.D.; Jennifer Navarre, R.N.; and Jessica Champagne, R.N., DefendantsAppellees.
No. 97-204.
Court of Appeal of Louisiana, Third Circuit.
March 6, 1998.
*1381 Before SAUNDERS, SULLIVAN and GREMILLION, JJ.
SAUNDERS, Judge.
This appeal arises out of a medical malpractice action filed by plaintiffs on behalf of the decedent, Kenneth Quibodeaux, due to his alleged wrongful death. Following a hearing on the issue of prescription, the trial court granted the defendants' peremptory exception of prescription and dismissed plaintiffs' claim. For the following reasons, we reverse.

FACTS
On the evening of August 24, 1992, while suffering from a heart attack, Kenneth Quibodeaux began vomiting and complaining of chest pains. After first suspecting a flu-like virus, the Quibodeauxs decided to seek medical treatment when Mr. Quibodeaux's chest pain did not resolve. The decedent's wife, Vivian Quibodeaux, drove her husband to the Medical Center of Southwest Louisiana (Medical Center) located at the corner of West Congress Street and Ambassador Caffery Parkway in Lafayette, Louisiana. Mrs. Quibodeaux drove directly to what she perceived to be the emergency room entrance of the Medical Center. In fact, Mrs. Quibodeaux had not approached the emergency room entrance, but rather the Medical Center's "Express Care" department. While approaching this entrance to the hospital, Diana Pommier, a hospital employee, saw car lights approaching the doors of the "Express Care" department and heard Mrs. Quibodeaux blowing the car horn. Ms. Pommier ran from the hospital to the automobile and *1382 was told by Mrs. Quibodeaux that her husband had just had a seizure.[1] Upon hearing this, Ms. Pommier ran back into the hospital to obtain assistance.
Moments later, a hospital nurse by the name of Jeanie East approached the vehicle. After learning that Mr. Quibodeaux had just suffered a seizure, Nurse East advised Mrs. Quibodeaux to drive her automobile around the hospital to the emergency room entrance. Mrs. Quibodeaux asked for specific directions to that location and immediately proceeded to the emergency room.
When Mrs. Quibodeaux pulled up to the emergency room entrance, she exited her car to assist a nurse and a male orderly in removing her husband from the vehicle. As she approached the passenger side door, Mrs. Quibodeaux heard a nurse ask a person she later learned was Dr. Marc LaPointe for assistance in removing her husband from the automobile. She looked to Dr. LaPointe and saw him raise his arms, as in resignation. At this, Mrs. Quibodeaux began returning to the driver's side door and told Dr. LaPointe, "Don't bother. If you don't want to come help us get him out of the car, just stay right there."[2]
At this point, Mrs. Quibodeaux pushed her husband's legs out of the vehicle while a nurse and the male orderly moved the upper portion of her husband's body onto the ground and then onto a stretcher. The nurse began CPR once Mr. Quibodeaux was on the ground. Once he was placed on the stretcher and brought into the hospital, the decedent was taken behind a curtain in the emergency room and attended to outside Mrs. Quibodeaux's vision. Unable to revive the decedent, Dr. LaPointe delivered this news to Mrs. Quibodeaux, who was, at that time, accompanied by her two sisters.
After her husband's death, Mrs. Quibodeaux was extremely angry with the manner in which Dr. LaPointe conducted himself. She contacted Nanette Castle, the hospital's patient representative, and explained that she felt Dr. LaPointe was extremely insensitive.[3] During the conversations with Ms. Castle, Mrs. Quibodeaux became frustrated and once threatened to advise the local newspaper of how she and her husband had been treated by Dr. LaPointe. Ms. Castle then arranged a meeting between Mrs. Quibodeaux and Dr. Lisa Smith, the Director of Physicians, so that Mrs. Quibodeaux could have a compassionate person with whom to speak and have someone apologize for Dr. LaPointe's rudeness. At this scheduled meeting, Mrs. Quibodeaux would have had the opportunity to review her husband's medical record with Dr. Smith; however, Mrs. Quibodeaux called shortly before the meeting and canceled due to an apparent conflict. Mrs. Quibodeaux did not attempt to reschedule the meeting.
On July 21, 1993, Mrs. Quibodeaux met with Mr. Kermit Doucet, a Lafayette attorney, to further discuss the manner in which she was treated during her husband's emergency at the Medical Center. Mrs. Quibodeaux sought to take some type of action against Dr. LaPointe in order to either procure an apology or in some way find him answerable for his rude behavior on the evening of the emergency. Mr. Doucet testified at the hearing on prescription that he was not aware of any suspicion on the part of Mrs. Quibodeaux regarding the possibility of medical malpractice. Mr. Doucet concluded his consultation with Mrs. Quibodeaux by suggesting she contact another attorney who specializes in such grievance matters, and he further advised her to write a letter to the administrator of the hospital in order to lodge a complaint.
*1383 During the month of April 1994, Ms. Diana Pommier, the hospital employee who had first approached the Quibodeaux vehicle on the night of the emergency, contacted Mrs. Quibodeaux by telephone and advised her that her husband was not treated properly by the hospital staff during his emergency. Ms. Pommier explained how she had run into the hospital requesting that a nurse immediately respond to the decedent, and that he should have been cared for through the "Express Care" entrance rather than being subjected to a delay in treatment while Mrs. Quibodeaux transported him across hospital grounds.
Ms. Pommier further informed Mrs. Quibodeaux of numerous improper actions on the part of several hospital employees. She stated that during the ordeal, she had notified the physician on duty, Dr. LaPointe, of the emergency. After being advised that he was needed immediately in the emergency room, Dr. LaPointe said, "Shit. Tell them I'll be there. I'm putting my shoes on."
Mrs. Quibodeaux alleges that until this point in time, other than the rudeness and insensitivity she was subjected to, she believed that the doctor and hospital employees had taken appropriate care of her husband. It was also from her conversation with Ms. Pommier that appellant learned for the first time that Ms. Pommier had written a comment sheet, wherein she filed a complaint with the nursing supervisor regarding the lack of responsiveness of the hospital staff to the Quibodeaux emergency. Mrs. Quibodeaux was also informed that Ms. Natalie Hebert, a nurse at the Medical Center, approached Ms. Pommier one or two days after the decedent's death and attempted to convince Ms. Pommier that decedent was dead upon arrival at the hospital. Ms. Pommier stated that Ms. Hebert was not present during the incident and recalled that Mr. Quibodeaux's color upon presentation to the hospital indicated to her that, in fact, he was still alive.
Mrs. Quibodeaux then contacted another attorney[4] and on July 31, 1995, a medical malpractice action was filed against the Medical Center of Southwest Louisiana on behalf of Mrs. Quibodeaux and her three minor children. The Medical Center filed a peremptory exception of prescription and a hearing on the matter was held on August 19, 1996. The trial judge granted the exception of prescription, finding that although Mrs. Quibodeaux did not have actual knowledge of substandard care, she should have known because she was "aware of the time frame between the arrival and inauguration of treatment." Additionally, the trial judge was persuaded by the fact that Mrs. Quibodeaux had access to her husband's medical records.
The Quibodeauxs have timely filed this appeal and allege two assignments of error. First, they allege that the trial court erred in excluding the testimony of their medical expert, Dr. Frank Robbins. Second, they contend that the trial court erred in sustaining the defendants' preemptory exception of prescription.

LAW AND ARGUMENT

Exclusion of Expert Testimony
Appellants allege that the trial court erred in excluding the testimony of their medical expert, Dr. Frank Robbins, at the hearing on the exception of prescription. Appellants claim that Dr. Robbins' testimony was necessary in order for Mrs. Quibodeaux and her children to show that they were neither willful, negligent, nor unreasonable for filing suit more than one year beyond the death of Kenneth Quibodeaux. Dr. Robbins' testimony was offered to establish: (1) that breaches of the standard of care did, in fact, occur, and (2) the degree of specialized medical training required to draw a causal link between Kenneth Quibodeaux's death and the actions of the defendants.
In excluding Dr. Robbins' expert testimony, the trial judge took "judicial notice that a lay person is not to be of the same knowledge as a physician as to what they should or should not know." As to other testimony offered by Dr. Robbins, the trial judge was of *1384 the opinion that it was not relevant to the prescription hearing.
Whether evidence is relevant is within the discretion of the trial court, and that ruling will not be disturbed by an appellate court absent a clear abuse of discretion. Hawthorne v. Hawthorne, 96-89 (La.App. 3 Cir. 5/22/96); 676 So.2d 619, writ denied, 96-1650 (La.10/25/96); 681 So.2d 365.
As the trial court noted, the legal issue before the court at the hearing on prescription was whether or not the plaintiffs were aware or should have been aware of the alleged act, omission, or negligence prior to the telephone call by Ms. Pommier. However, finding that Dr. Robbins' testimony was clearly relevant in resolving this issue, we find that the trial judge was clearly wrong in excluding this evidence.
Relevant evidence is that which tends to make the existence of any fact more or less probable. La.Code Evid. art. 401. Dr. Robbins' testimony, both regarding the existence of malpractice and a lay person's knowledge, helped make the existence of the plaintiffs' reasonableness more probable than it was without the testimony.
Specifically, Dr. Robbins identified several breaches in the standard of care owed to Mr. Quibodeaux. These include: (1) delaying the institution of appropriate therapy to stem the impact of a heart attack; (2) redirecting the patient to another hospital entrance; (3) inappropriate intervention of a patient in ventricular fibrillation; and (4) administering incorrect doses of medication. In this proffered testimony, Dr. Robbins gave detailed explanations of each of the above alleged breaches in the standard of care.
Directly related to the above opinions, Dr. Robbins further testified that a lay person would not have known the importance of these features of the decedent's care without advance cardiac life support training. This testimony was very important in establishing the fact that even though her husband's medical records were available to her, medical assistance in reviewing these records would have been required to identify the improper acts on the part of the hospital. Had Mrs. Quibodeaux obtained and read her husband's medical chart, she would have learned the defendants' description of what was done for her husband, but she could not have interpreted the propriety of the defendants' actions. Furthermore, Dr. Robbins' testimony established that whether or not Mrs. Quibodeaux had the ability to recognize the type of medications her husband received during his treatment, this would in no way have alerted a lay person to whether the correct dosages of those drugs were administered. Finally, Dr. Robbins offered his professional medical judgment as an expert emergency room physician that Mrs. Quibodeaux could not have reasonably appreciated the facts and timing of events as they occurred outside of the hospital.
In sum, Dr. Robbins' opinions regarding the specific breaches of the standard of care, causation, and whether a lay person would appreciate the defendants' negligence without advanced cardiac life support training were clearly relevant to the determination of the issues facing the trial court and, as such, we have considered the proffered testimony in our analysis.

Sustaining Exception of Prescription:
Finding that the proffered testimony should have been allowed, we now turn to the question of whether the trial judge was correct in granting the defendants' peremptory exception of prescription.
Generally, the prescriptive period for a medical malpractice action is one year from the date of the alleged act, omission, or neglect, or within one year from the date of discovery of the alleged act, omission, or neglect. Furthermore, regardless of the date of such discovery, any claim must be filed no later than three years from date of the alleged act, omission, or neglect. La.R.S. 9:5628.
This prescriptive period, however, does not apply to wrongful death actions, even when arising out of a medical malpractice action. Instead, the commencement and running of the prescriptive period for a wrongful death action is controlled by the one year liberative prescriptive period applicable to delictual actions, La.Civ.Code art. 3492, and the action is available to those classes of beneficiaries named in La.Civ.Code *1385 art. 2315.2. Taylor v. Giddens, 618 So.2d 834 (La.1993).
There are two ways in which prescription can be delayed: by interruption or by suspension. If prescription is interrupted, the time that has run is not counted, and prescription commences to run anew from the last day of interruption. La.Civ.Code art. 3466. When prescription is suspended, the period of suspension is not counted toward the accrual of prescription, and prescription commences to run again upon the termination of suspension. La.Civ.Code art. 3472. Although generally, prescription continues to run absent an express legislative exception, in limited circumstances the judicially created doctrine of contra non valentem agere nulla currit praescriptio (contra non valentem) will serve to suspend the running of prescription. See Corsey v. State Dep't of Corrections, 375 So.2d 1319 (La.1979).
Pursuant to the doctrine of contra non valentem, the discovery rule provides that prescription commences to run on the date the injured party discovers or should have discovered facts upon which his cause of action is based; hence, prescription does not accrue as it does not run against one who is ignorant of facts upon which his cause of action is based, as long as such ignorance is not willful, negligent, or unreasonable. Wimberly v. Gatch, 93-2361 (La.4/11/94); 635 So.2d 206.
The trial court found that Mrs. Quibodeaux should have known of the link between her husband's death and the alleged malpractice on the part of the defendants since she was present when the care was initiated and, she had access to her husband's medical records and failed to review them. Appellants contend that the trial court erred in sustaining the defendants' exception of prescription on these grounds.
The Louisiana Supreme Court in Griffin v. Kinberger, 507 So.2d 821 (La.1987), sets forth the appropriate legal principles which should be considered in determining whether the doctrine of contra non valentem will suspend the running of prescription in a medical malpractice action:
The one-year prescriptive period commences running on the date the injured party discovers or should have discovered the facts upon which his cause of action is based. Lott v. Haley, 370 So.2d 521 (La. 1979). Constructive knowledge sufficient to commence the running of prescription, however, requires more than a mere apprehension that something might be wrong. Cordova v. Hartford Accident & Indemnity Co., 387 So.2d 574 (La.1980). Prescription does not run against one who is ignorant of the facts upon which his cause of action is based, as long as such ignorance is not willful, negligent or unreasonable. Young v. Clement, 367 So.2d 828 (La.1979). Thus, even if a malpractice victim is aware that an undesirable condition developed at some point in time after the medical treatment, prescription does not run as long as it was reasonable for the victim not to recognize that the condition may be related to the treatment.
Id. at 823-24.
In light of the above legal principles, the paramount issue before this court is whether, considering the specific facts and circumstances of this particular case, Mrs. Quibodeaux was reasonable in failing to recognize that her husband's death was caused by the defendants' action or inaction. Since we find that Mrs. Quibodeaux was reasonable in her lack of knowledge of facts giving rise to her cause of action, contra non valentem has served to suspend the running of prescription until the date she actually learned of these pertinent facts, i.e., the date of the phone call from Ms. Pommier.
The trial judge found that prior to Ms. Pommier's phone call in April of 1994, Mrs. Quibodeaux did not have actual knowledge of facts which would have alerted her to the possibility of a medical malpractice claim. However, the trial court did find that Mrs. Quibodeaux had constructive knowledge, and thus, found "that the information provided by Ms. Pommier was not of such a nature as to provide a basis for the suspension of the one year prescriptive [period]." In reaching this conclusion, the trial judge stated that Mrs. Quibodeaux "was present, with her husband, at all times prior to, during, and after care was provided at Hamilton Medical Center." He further found that "the only information which wasn't obvious and apparent to Mrs.
*1386 Quibodeaux were those words spoken outside of her presence between Ms. Pommier and a nurse and a physician. This information deals with the alleged tardiness and the providing of care. This information should have been documented on hospital records which were available and requested by the plaintiff but never picked up."
The trial judge fails to note, however, that much of the care rendered to Kenneth Quibodeaux took place behind a curtain through which Mrs. Quibodeaux could not see. Furthermore, it was here when the electric shocks and drugs were allegedly administered in an improper fashion. This, coupled with the proffered testimony of Dr. Robbins, convinces us that Mrs. Quibodeaux's lack of knowledge of facts giving rise to a possible medical malpractice claim was reasonable. As far as the treatment rendered to the decedent in the presence of Mrs. Quibodeaux, other than Dr. LaPointe's rudeness, there was no substantially suspect event which would have alerted her to the possibility of malpractice. The delays which took place outside of the hospital appeared to be momentary, and Mrs. Quibodeaux could have reasonably believed that it was more expedient for her to drive her husband to the emergency room from the "Express Care" department. Furthermore, even if the CPR performed in her presence was improperly administered, she would not have been aware of this under the circumstances.
We are further persuaded by the testimony of Kermit Doucet, Nanette Castle, and the sisters of Mrs. Quibodeaux. At the prescription hearing, each of these individuals testified to the effect that Mrs. Quibodeaux's dissatisfaction with the events surrounding her husband's death had nothing to do with any suspicion of medical malpractice, but rather was based solely on the insensitivity and rudeness displayed by Dr. LaPointe on the evening of her husband's death. This testimony serves to further buttress the trial court's finding that Mrs. Quibodeaux did not have actual knowledge of facts which should have alerted her to a possible malpractice action. In our view, the record also failed to establish a basis for attributing Mrs. Quibodeaux with constructive knowledge of sufficient facts upon which her claim is based.

DECREE
In view of the foregoing, we find that the doctrine of contra non valentem properly applies to the facts of this case. Mrs. Quibodeaux was reasonable in her unawareness of any facts giving rise to a claim for medical malpractice on the part of the defendants until she was apprised of such facts by Ms. Pommier's phone call in April of 1994. Thus, prescription was suspended until the date of this phone call, and since the Quibodeauxs sought redress within one year beyond the phone call, their claims have been timely filed.
Accordingly, the judgment of the trial court sustaining the defendants' exception of prescription and dismissing plaintiffs' action with prejudice is hereby reversed. This matter is remanded to the trial court for further proceedings consistent with the opinions stated herein. All costs of this appeal are assessed to appellees.
REVERSED AND REMANDED.
NOTES
[1] At this point, Mrs. Quibodeaux was not sure what was wrong with her husband. She presumed that he was suffering from a seizure due to his overall demeanor while in route to the hospital.
[2] Although Dr. LaPointe was less than helpful in removing Mr. Quibodeaux from the vehicle, this apparently did not add to the delay in treatment, as a nurse and male orderly were already in the process of removing the decedent.
[3] Ms. Castle testified at the hearing on the exception of prescription that at no time in any conversation with Mrs. Quibodeaux did appellant ever suggest that she suspected medical malpractice on the part of Dr. LaPointe or the hospital employees who treated her husband. Apparently, all of Mrs. Quibodeaux's complaints handled by Ms. Castle were directed toward the insensitivity and rudeness of Dr. LaPointe.
[4] Apparently, Ms. Pommier referred Mrs. Quibodeaux to her attorney in this matter, who was the law partner of Ms. Pommier's attorney. Ms. Pommier had contacted an attorney for possible action against the Medical Center after she was terminated from her position there.