865 So.2d 924 (2004)
Wanda Ann Sellers DAY and Douglas C. Day, Plaintiffs-Appellants,
v.
MOREHOUSE GENERAL HOSPITAL, Defendant-Appellee.
No. 37,803-CA.
Court of Appeal of Louisiana, Second Circuit.
January 28, 2004.
*925 John Layne Hammons, Shreveport, Annis Cornell Flournoy, for Appellants.
William Edward Bourgeois, Morgan City, for Appellee.
Before CARAWAY, DREW and MOORE, JJ.
DREW, J.
From a 1967 blood transfusion administered at Morehouse General Hospital (MGH), Wanda Ann Day contracted hepatitis C, which resulted in her 1999 death at age 63. The decedent and her husband brought a product/strict liability claim based upon the sale and administration of defective blood. Following her death, Mr. Day and the couple's adult children amended the petition and sued for damages for wrongful death based upon the contaminated blood. The trial jury concluded that the administration of blood did not constitute a sale and found in favor of MGH. The Day family appealed. At issue is whether the plaintiffs have a cause of action for the alleged wrongful 1999 death *926 which arose from the contaminated 1967 blood transfusion. For the following reasons, the judgment is affirmed.
We conclude that the trial court erred in denying MGH's Motion for Summary Judgment, which urged that the Day family had no cause of action in strict liability in 1967 when the transfusion was administered or in 1999 when their wrongful death action came into existence at Mrs. Day's death. Therefore, discussion of a number of issues raised by the parties to this appeal are pretermitted.
 FACTUAL AND PROCEDURAL TIME LINE
07-15-1967 Mrs. Day admitted to MGH for appendicitis and cystic ovary.
07-18-1967 Mrs. Day's appendix and right ovary removed; Mrs. Day transfused with
 one pint of whole blood.
07-22-1967 Mrs. Day discharged.
08-31-1967 Mrs. Day hospitalized with diagnosis of serum jaundice.
09-10-1967 Discharged from MGH.
11-1997 Diagnosed with hepatitis C.
10-22-1998 Days filed a product liability suit against MGH, based on the sale and
 administration of contaminated blood.
11-10-1998 MGH answered.
04-02-1999 Mrs. Day died of hepatitis C.
06-02-1999 Plaintiff amended to claim wrongful death and survival action.
07-12-1999 MGH answered and filed third party demand against Dr. Naj Klam, who
 supplied all blood to MGH.
07-30-1999 In second supplemental petition, Day added adult children as plaintiffs.
08-12-1999 MGH answered.
09-23-2002 Dr. Klam's Motion for Summary Judgment granted and MGH's claim
 against him dismissed with prejudice.
11-04-2002 Jury ruled 11-1 in favor of defendant. The "Civil Jury Verdict Form"
 returned by the jury answered in the negative, "Do you find that the blood
 given to Wanda Day was a sale of a product?" Based on that conclusion,
 no other jury interrogatories were answered.
10-15-2002 Judgment signed.
10-21-2002 Notice of Judgment sent.
10-25-2002 Plaintiffs filed a Motion for JNOV.
01-27-2003 JNOV denied.
*927 It is undisputed that the blood administered to Mrs. Day in 1967 infected her with hepatitis C, which resulted in her death in 1999. Further, the parties agree that hepatitis C was not identified as a distinct disease and labeled until 1989.

LAW
In David v. Our Lady of the Lake Hospital, Inc., 2002-2675 (La.7/2/2003), 849 So.2d 38, Justice Weimer, writing for the majority, included a detailed discussion of the history of Louisiana's blood shield laws.[1] The first blood shield law was enacted in 1968, treated administration of blood as a service (not a sale subject to warranty), and withstood several constitutional challenges. David, supra. Mrs. Day's transfusion obviously predated the blood shield laws.
In 1975, the legislature enacted a series of laws limiting the rights of medical malpractice claimants, including the requirement that actions be brought within one year of the date of alleged malpractice or, in any case, within three years from the act. La. R.S. 9:5628. In DeBattista v. Argonaut-Southwest Ins. Co., 403 So.2d 26 (La.1981), the court first held that a plaintiff seeking recovery for a tainted 1973 transfusion had a cause of action in strict liability. David, supra.
In 1981, the legislature enacted La. C.C. art. 2322.1 and La. R.S. 9:2797, which directed that strict liability was not applicable to physicians, hospitals, etc., for transfusions of human blood which resulted in the transmission of viral diseases undetectable by appropriate medical tests. The legislature limited the laws to causes of action arising after the effective dates of La. C.C. art. 2322.1 and La. R.S. 9:2797. In Branch v. Willis-Knighton Medical Center, 92-3086 (La.4/28/94), 636 So.2d 211, the supreme court ruled that for a cause of action vested prior to the enactment of the blood shield laws, the plaintiff and other pre-1981 recipients of defective blood could not be divested of their rights against providers of blood. David, supra.
In 1999, the legislature enacted La. R.S. 9:5628.1, which directed that an action for damages based upon negligence, products liability, strict liability, tort, breach of contract or otherwise, must be brought within one year of the date of the act or one year from discovery of damage, but in any event, must be brought within three years from the act. This provision did not apply to legal proceedings filed prior to the effective date of R.S. 9:5628.1; i.e., June 30, 1999. David, supra.
In Williams v. Jackson Parish Hospital, 00-3170 (La.10/16/01), 798 So.2d 921, the court, citing Branch, supra, concluded that pre-1982 claims against hospitals in strict liability are not traditional medical malpractice cases and are not governed by R.S. 9:5628, but by La. C.C. art. 3492. David, supra.
In David, supra, a prescription case, the court held that plaintiff's claim of strict liability in tort for the 1979 transfusion of blood contaminated with hepatitis C, filed against the private hospital which was not a qualified health care provider at the time of the blood transfusion, was prescribed pursuant to the provisions of La. R.S. 9:5628. The David opinion overruled all previous inconsistent holdings.

The Day Family Argument re Applicable Law
Plaintiffs acknowledged that the decedent's survival action prescribed in 1968, since she was hospitalized shortly after the *928 1967 transfusion with serum hepatitis. Therefore, the Days limited their claims against MGH for wrongful death under strict liability for the administration of contaminated blood. In the Days' view, all hepatitis C cases arising from transfusions administered prior to July 15, 1982, give rise to a cause of action in strict liability as a matter of law. Plaintiffs argue that on the effective date of the blood shield law, July 15, 1982, the administration of blood became a service, but prior to that date, blood was a product sale, as a matter of law. The plaintiffs assert that only two defenses are available under law in this action; i.e., (1) the blood was unavoidably unsafe,[2] or (2) the damage was caused by a third party. Plaintiffs' contentions that the strict liability law is applicable to this 1967 transfusion is belied by the supreme court's statement in David, supra, which specifically pretermitted the question of whether a health care provider who administered blood contaminated with hepatitis C prior to 1975 could be held strictly liable to a patient.
The Day family maintains that the date of the transfusion determines which law applies, and the applicable law for their strict liability claim is La. C.C. art. 2317 in effect in 1967, which stated, in pertinent part:
We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody.
The plaintiffs contend that for MGH to escape liability, it had to prove at trial, but failed to do so, that the blood given in 1967 to Mrs. Day was incapable of being made safe, was properly prepared, and was accompanied by a proper warning.

MGH's Argument re Applicable Law
Because the Day family admitted the decedent's survival action prescribed in 1968, MGH urges that the plaintiff's wrongful death action did not arise until Mrs. Day's death in 1999. In Taylor v. Giddens, 24,054 (La.10/18/93), 618 So.2d 834, the supreme court explained that survival and wrongful death actions are separate and distinct even though they arise out of the same tort, since each arises at a different time and addresses damages for totally different injuries and losses. In Taylor, supra, the court applied the medical malpractice prescriptive period (La. R.S. 9:5628) to the survival action. To the wrongful death action, Taylor applied the one-year period for delictual actions. La. C.C. art. 3492. Since the Day family's cause of action for wrongful death arose at Mrs. Day's 1999 death, MGH contends that the blood shield laws were in force and applicable to this action.

DISCUSSION
An exception is a defense, other than a denial or an avoidance of the demand. La. C.C.P. art. 921. The purpose of a peremptory exception is to have plaintiffs' claim declared legally nonexistent or barred by effect of law, leading to a dismissal. *929 La. C.C.P. art. 923. An exception of no cause of action is peremptory and may be noticed by the trial or appellate court on its own motion. La. C.C.P. art. 927. No evidence may be introduced at any time to support or controvert the objection that plaintiffs' petition fails to state a cause of action. La. C.C.P. art. 931. If the grounds of the peremptory exception of no cause of action cannot be removed by amendment of the pleadings, then the action shall be dismissed. La. C.C.P. art. 934. The function of the peremptory exception of no right of action is to determine whether the plaintiffs belong to the class of persons to whom the law grants the cause of action asserted in the suit. Deal v. Powell, 37,686 (La.App.2d Cir. 12/10/03), 862 So.2d 398.
In Chauvin v. Sisters of Mercy Health System, St. Louis, Inc., XXXX-XXXX (La. App. 4th Cir.5/8/02), 818 So.2d 833, writ denied, XXXX-XXXX (La.9/30/02), 825 So.2d 1194, plaintiffs sued in 1998 for hepatitis C allegedly contracted in a 1963 transfusion. The court affirmed the dismissal of the plaintiffs' action via summary judgment based on the conclusion that no cause of action for strict liability based upon a blood transfusion existed in 1963. The Chauvin opinion pointed out that in 1971, Weber v. Fidelity & Cas. Co. of N.Y., 259 La. 599, 250 So.2d 754 (1971), the court defined fault for purposes of products liability and marked the point at which the Louisiana Supreme Court adopted the strict products liability in tort theory, which was reflected in the Restatement (Second) of Torts, 1965. The Chauvin court carefully observed the strained comparison between a defective manufactured product as opposed to naturally-occurring blood and noted that hepatitis C is not a by-product of the preparation of blood for transfusion. The first time the court recognized strict liability for a blood transfusion was in DeBattista,[3]supra, in 1981.
The Chauvin opinion stated:
Hepatitis C was unknown in 1975. Turnage v. Columbia Lakeside Hospital, 98-1263 (La.App. 5 Cir. 3/30/99), 731 So.2d 919, 922. Per force, it was unknown in 1963. Prior to the time that it was specifically identified as Hepatitis C, it was lumped in the category of non-A non-B Hepatitis. Even this category was unknown in 1963. As its existence was unknown, no test existed in 1963 to detect it. In 1963 no steps would have been taken to prevent what was not known to exist....
Chauvin, supra, at p. 835.
Although the Restatement (Second) was published in 1965, we observe that the seminal Louisiana cases on strict liability discussed by Chauvin were decided long after Mrs. Day's 1967 transfusion. Adopting the Chauvin court's reasoning, we conclude that a strict liability cause of action for an allegedly defective blood transfusion did not exist at the time of Mrs. Day's 1967 transfusion.
Even if we found that the plaintiffs properly proceeded under strict liability, we find that evidence presented at trial supported the findings that the blood was "unavoidably dangerous" when transfused into Mrs. Day in 1967. Further, there was also testimony that the responsibility for testing the blood rested with a third party, not MGH.
Dr. Philip Weinstein, the decedent's family care physician at her death, testified:
*930  Her death resulted from hepatitis C complications.
 In 1967, no test was available for hepatitis C, which had not been identified as a disease.
 Blood had great utility, and there was no substitute for blood.
The plaintiffs' expert, Dr. David Dies, a gastroenterologist and a hepatologist, stated that he spent a significant part of his time treating hepatitis C patients. Dr. Dies testified:
 In the 1960s, there was no test for hepatitis C, which disease was unknown.
 Although the ALT test for elevated liver enzymes was developed by 1960, the blood banking community did not decide to use the test until 1986.
 Once the ALT test was used, there was a reduction in the number of persons contracting post-transfusion hepatitis C.
 An ALT test would reveal elevated liver enzymes in 75% of hepatitis C patients, but 25% of hepatitis C sufferers do not have elevated enzymes.
 Today, hepatitis types E, F, G, H and I exist, for which there are no tests.
 It was reasonable for MGH to rely upon the blood bank to perform appropriate testing in 1967 and now.
 There is no way in 1967 and 2002 to make sure blood products are completely safe because the current tests are not 100% and the ALT was even less accurate [in the 1960s].
Dr. Najeeb Klam testified that he was a pathologist who, as a consultant, ran the laboratory and blood bank in 1967 for MGH. Dr. Klam stated:
 The donor came from a Memphis blood bank.
 The 1966 standards of the American Association of Blood Banks (AABB) were applicable to all blood banks in 1967 that the possibility of viral hepatitis in blood could not be eliminated by testing.
 MGH followed all standards in the transfusion of blood.
 Only doctors could order a patient infused with blood.
 Blood bank standards in 1967 did not include testing for elevated liver enzymes.
 A 1981 JAMA article reported that ALT testing could have detected 29% of post-transfusion hepatitis.
Nancy Cook, the present head medical technologist at MGH, testified that in 1967 and in the present, the AABB required MGH to recheck the blood type and Rh factor. She agreed to previous testimony that in 1967, there was no test to detect hepatitis C, which was unknown. MGH had no records on the donor of the blood transfused into Mrs. Day.
Dr. Johnny Max Emanuel, the current lab director at MGH, testified that in 1967 there was no test for hepatitis C, which had not been identified as a disease at that time. Further, MGH administered the blood to Mrs. Day in compliance with the applicable standards in effect. Any additional testing beyond typing and Rh factoring is the responsibility of the site where the blood is collected. Dr. Emanuel was unaware of any hospital that tested for liver enzymes before administering blood. The 1981 study said that 29% of hepatitis C sufferers would be eliminated by ALT testing, not 75% as stated by Dr. Dies. In 1968, the hospital charged service and storage fees for donated blood, which lasted 21 days. Although we have decided that the Days had no cause of action in strict liability in 1967, even if we applied strict liability to this claim, the blood administered to Mrs. Day was "unavoidably unsafe."
*931 The plaintiffs' wrongful death claim arose when Mrs. Day died in 1999. Taylor v. Giddens, supra. In 1999, Louisiana's blood shield laws had been in effect for many years. The Day family's June 2, 1999, suit predated the 1999 enactment of R.S. 9:5628.1 and the amendment of La. R.S. 9:2797, which came into effect June 30, 1999, and applied only to actions filed after the effective date. Prior to the 1999 revisions, La. R.S. 9:2797 stated:
The screening, procurement, processing, distribution, transfusion, or medical use of human blood and blood components of any kind and the transplantation or medical use of any human organ, human tissue, or approved animal tissue by physicians, dentists, hospitals, hospital blood banks, and nonprofit community blood banks is declared to be, for all purposes whatsoever, the rendition of a medical service by each and every physician, dentist, hospital, hospital blood bank, and nonprofit community blood bank participating therein, and shall not be construed to be and is declared not to be a sale. Strict liability and warranties of any kind without negligence shall not be applicable to the aforementioned who provide these medical services.
The 1971 Weber decision marks the point at which the Louisiana Supreme Court adopted the strict products liability in tort theory, which was reflected in the Restatement (Second) of Torts, 1965. The plaintiffs' contentions that applying the 1990 version of the blood shield law to a 1967 transfusion is an impermissible retroactive application of the law are without merit. In Martin v. State, XXXX-XXXX (La. App. 4th Cir.8/22/01), 811 So.2d 3, writs denied, XXXX-XXXX, XXXX-XXXX (La.2/7/03), 836 So.2d 95, a viral hepatitis claim from a 1977 blood transfusion, the court applied the blood shield laws in effect when the decedent died in 1994 and when the suit was filed in 1995. The Martin court at p. 8 went on to hold:
Specifically, the [blood shield] statutes protect from strict liability certain classes of persons and entities with respect to specified types of activities, so that it is based upon their status. Consequently, the statutes are not laws governing conduct. Thus, the application of the statutes to a transfusion occurring prior to their enactment does not constitute "retroactive" application[4] of the statutes.
Therefore, to apply the blood shield law in effect at the time Mrs. Day died and when her suit was filed is not an impermissible retroactive application of the law.

DECREE
For the foregoing reasons, we find that the Days did not have a cause of action against MGH. We affirm the trial judgment and dismiss plaintiffs' action with prejudice, since no amendment to the petition exists under the circumstances of this case. All costs are assessed against the plaintiffs.
AFFIRMED.
NOTES
[1] See, David, supra, 849 So.2d at pp. 41-49.
[2] Restatement (Second) of Torts § 402A, comment k, states that "[t]here are some products which in the present state of human knowledge, are quite incapable of being made safe for their intended use.... Such a product, properly prepared, and accompanied by proper directions and warning, is not defective, nor is it unreasonably dangerous.... The seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk."
[3] DeBattista was legislatively overruled and specifically overruled by the supreme court in David, supra.
[4] See Justice Victory's discussion in Anderson v. Avondale Industries, Inc. 2000-2799 (La. 10/16/01), 798 So.2d 93, pp. 97-99, which cites 1 Planiol, Treatise on the Civil Law, § 243 (La.St.L.Inst.Trans.1959).